*H. C. Newcomb* and *J. S. Harvey*, for the appellant.

*C. C. Nave*, for the appellees.

---

## COLEMAN *v.* DOBBINS.

The courts will not judicially notice the contents of the legislative journals: their judicial knowledge does not extend to the history of statutes on their passage through the legislature.

The facts in relation to the passage of an act, would, if formally presented, be a proper subject of judicial inquiry and determination.

*Quære*, are the legislative journals' records kept in obedience to the constitution?

If so, it seems that when a party claiming any right or defense growing out of the action of the assembly, brings the parts of the journal relied upon to the judicial knowledge of the Court, they will be inspected like other records, and the Court will determine whether the legislative action they record, on the bill in question, is in accordance with the constitution.

Suppose a bill pass the House of Representatives by a vote of fifty-one yeas, and go to the Senate, where, by amendment, the House bill is stricken out from the enacting clause, and a new bill inserted. It passes the Senate by a vote of twenty-six yeas. The House, ninety members present, concur in the amendment of the Senate by a vote of forty-six yeas, without reading the amendment by sections on three several days: *Quære*, which of these is in reality the final passage in the House, on which the yeas and nays must be called, and a majority of all the members elect must be found voting in the affirmative? Is the bill thus concurred in the same which the House first passed? And is such a proceeding in conformity to the constitution?

The courts will presume that the printed statutes published "by author-

ity" were passed in the proper form, with the requisite solemnities, and in conformity with the constitution, until the contrary appears.

The *English* doctrine that *nul tiel* record cannot be pleaded to a statute, does not apply in the *United States*.

The transcript must show that matter assigned in the Supreme Court for error, was properly presented in the Court below, and adjudicated.

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

APPEAL from the *Shelby* Court of Common Pleas.

STUART, J.—*Nancy Dobbins*, the complainant, is the wife of *William Dobbins*, and this action is brought by her against *Isaac Coleman*, a licensed retailer of spirituous liquors, on his bond, under the liquor law of *March*, 1853. The action was commenced before a justice of the peace, where the plaintiff, *Nancy*, had judgment for 72 dollars. *Coleman* appealed to the Circuit Court, where there was a jury trial, verdict and judgment for 65 dollars; and judgment for costs against the plaintiff. *Coleman* appeals to this Court.

*Friday,*
*November 27.*

The law authorizing the action is found in the Acts of 1853, ch. 66, p. 87. The first section provides, "That no person shall retail spirituous liquors, except for sacramental, mechanical, chemical, medicinal, or culinary purposes, without filing with the auditor of the proper county his bond, with at least four freehold sureties, to be approved by such auditor in the penal sum of not less than 500, nor more than 2,000, dollars—proportioned according to the number of inhabitants of the township—conditioned for keeping an orderly house, and for the payment of all fines, penalties, or damages, that may be incurred under the provisions of this act."

The third section provides that upon filing such bond the auditor shall grant to the party licence to retail.

The fourth section defines the word "retail" to mean the sale or barter, direct or indirect, of any quantity less than one gallon.

We take no notice of the provision in relation to the township vote, as that has been declared unconstitutional in *Maize* v. *The State*, 4 Ind. R. 342.

The tenth section provides that, "Any wife, child,

parent, guardian, employer, or other person, who shall be injured in person or property or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, or any person, shall have right of action in his or her own name, against any person and his sureties of the bond aforesaid, who shall by retailing spirituous liquor, have caused the intoxication of such person, for all damages sustained and for exemplary damages."

Section twelve further provides that, "for all purposes under this act, whether to institute or prosecute the suit, to control the recovery or otherwise, a married woman shall have the same rights as if she were single."

The fourteenth section enacts that "a recovery against a retailer shall be conclusive evidence against his sureties, in an action upon the bond hereinbefore provided for, both as to the right of action, and as to the amount of damages."

These are all the provisions directly bearing on the question before us. They have been introduced to explain what might otherwise appear anomalous in the case at bar. It was competent for the legislature, and it was clearly intended, to confer on the wife, while *feme covert*, a right of action in her own name, without her husband, in contravention of the settled doctrine of the common law.

It is equally clear from the tenth and fourteenth sections taken together, that she may proceed against the retailer alone on his bond, or against him and his sureties jointly, with like effect as to the ultimate liability of the sureties.

The errors assigned are, 1. The bond is void, because made payable to the auditor of the county, instead of to the State of *Indiana*.

The first section, it will be perceived, is not explicit as to whom the bond should be made payable. But if there is any defect in that respect, the objection comes too late in this Court, raised for the first time on error. He should have demurred to the complaint at the pro-

Nov. Term, 1856.

COLEMAN
v.
DOBBINS.

per time, and raised that question in the Court below. There is no demurrer in the record. By failing to make the point at the proper time in the lower Court, he has waived every objection except to the jurisdiction of the Court. 2 R. S. 39. In this connection it is proper to state, that the transcript was filed in this Court as early as *September*, 1854, so that the case is not affected by any subsequent legislation in reference to what is waived. Acts 1855, p. 60. And as a pending suit it is saved from repeal. *Id.* p. 222.

2. The second error assigned is in these words: " The law authorizing such bond, to retail, &c., was void because the bill (the liquor act of *March*, 1853,) was not read with the amendments, the number of times requisite to the validity of a law, under the new constitution."

It is presumed that counsel have reference to section 18, article 4, of the constitution, requiring every bill to be read by sections on three several days, and the vote on its final passage to be taken by yeas and nays. And to section 25 of the same article, which requires a majority of all the members elected to each House, to pass a bill. 1 R. S. pp. 51 and 53.

A question so vital in its bearings on legislation, was deemed too important to be passed upon hastily. At the request of the Court it was re-argued orally; and it was understood that any member of the bar having even a contingent interest in the result, might be heard.

Two inquiries are suggested by this assignment, 1. Whether the Court will go behind the statute to look into the mode of its passage; 2. And if so, how is the question to be presented to the Court?

1. The most superficial must admit that a question, pregnant with such disastrous consequences as this, in certain contingencies, might be, should arrest the attention of every department of the government.

The language of the constitution is very explicit as to the mode of passing bills; and what is more, it will be perceived that it is not merely directory, but imperative. " A majority of all the members elected to each

House, shall be necessary to pass every bill." s. 25. Every bill shall be read by sections on three several days in each House. s. 18. It is not easy to see upon what principles a statute, passed in derogation of these constitutional requirements, could be sustained.

That the facts in relation to the passage of an act, would, if formally presented, be a proper subject of judicial inquiry and determination, cannot be doubted. For, otherwise, the people would be deprived of all the guards and checks which the constitution was intended to erect between them and the encroachments of their public servants. The constitution is a law to even the law-making power. What the people say in that instrument shall be, must be, and there must, of necessity, be some mode of arresting any infraction of its provisions. On any other hypothesis, the experiment of constitutional restrictions on delegated power, would be a total failure.

The inquiry behind the statute to see whether it was constitutionally passed, is by no means so novel as many suppose. *The People* v. *Purdy*, 2 Hill, 31; *Purdy* v. *The People*, 4 Hill, 384; 10 Harris's Penn. R. 376; *Fowler* v. *Pierce*, 2 Cal. R. 163; *Skinner* v. *Deming*, 2 Ind. R. 560; *Miller* v. *The State*, 3 Ohio R. 475; *The People* v. *The Supervisors*, &c., 4 Selden, 317; 14 Illinois R. 113. (1) All these cases, and others which might be cited, admit the power of the courts to inquire whether the law was passed in conformity to the constitution. The courts cannot compel the legislature to act. They assume no such power. They only assume to inquire when a case is properly made, 1. Whether the provisions of the law are consistent with the constitution; 2. Whether it was passed as the constitution prescribes. If, upon examination, the courts conclude in the negative on either point, they have no option but to declare the law void.

We will not stop to discuss the object of the legislative restraints in the sections quoted. That would lead to the consideration of various topics, such as the mischief

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

intended to be remedied. These particulars we do not wish to anticipate. But there are words in those sections of the constitution which deserve attention. For instance, what is to be regarded as the passage of a bill within the meaning of the constitution? Suppose a bill pass the House of Representatives by a vote of fifty-one, being a majority of all the members elected. It goes to the Senate. By amendment the House bill is stricken out from the enacting clause, and an entirely new bill is inserted. It passes the Senate by a constitutional majority, twenty-six senators voting for it. The House, ninety members present, concurs in the amendment of the Senate by a vote of forty-six yeas, without reading the amendment by sections on three several days. Which of these is in reality the final passage in the House, on which the yeas and nays must be called, and a majority of all the members elected must be found voting in the affirmative?

The plain question is, whether the bill, thus concurred in, is the same which the House first passed. And is such a proceeding in conformity to the constitution? (2)

2. How should the question be presented? as a question of law or of fact?

Courts are presumed to know the law. Thus the provisions of a public statute must be judicially noticed whenever they are applicable to pending cases. But to know the law does not imply a knowledge of all the steps attending its passage. We are not aware that it is the duty of the courts to take judicial notice of the course of legislation, or the contents of the journals. 1 Greenl. Ev. 10 (3). We are not presumed to know the facts which transpire in the progress of a bill through the two houses of the General Assembly. Courts will sometimes, in aid of exposition, look to the reasons for enacting the law. But if upon the suggestion of such error as is here assigned, we were in duty bound to explore the journals of the two houses, to ascertain whether every step required by the constitution had been taken, the labor imposed would be endless.

VOL. VIII.—11.

Besides, something is to be presumed in favor of the action of the legislature. When we find a law in print published "by authority," we must, in courtesy to a co-ordinate department, and in analogy to the various presumptions which arise in favor of official action, presume that it had been passed in the proper form, and with the requisite solemnities. The courts cannot do less. It is due to the legislature to take it for granted, until the contrary appears, that the statutes were enacted in conformity to the constitution.

The *New York* constitution of 1823, required bills affecting corporations to be passed by a two-thirds vote. And the revised statutes required the presiding officers to certify that the bill had been passed by two-thirds; otherwise it would be deemed a majority bill. 1 R. S. (N. Y.) 156. Thus the certificate of how it did pass,—whether by two-thirds or a majority,—became a part of the law. This, the courts say, they will determine by inspection, as they would a record. And this is as far as the courts have gone, treating it as a question of law.

It has been said above that the courts will not notice judicially the course of legislation. Perhaps, to prevent misconception, that intimation had better be explained and illustrated. We will take judicial notice of the existence of the legislature, and of its regular sessions. We will also notice its enactments, so far as they are public acts, published by authority. But it is familiar to every lawyer that the courts will not judicially notice private acts. The party claiming any right under a private act, must plead it. Yet such private act is part of the course of legislation. It is published as an act of the legislature. But so far from the courts taking judicial notice of the several steps of its progress through the two houses, they will not judicially notice such private act even when it is published as a law.

We take it, then, to be clear that our judicial knowledge is not presumed to extend to the history of every statute in its passage through the legislature.

Our knowledge of the journals of the two houses is

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

no more judicial than is our knowledge of the order-books of the Circuit Courts or the Common Pleas Courts, or those of the board of commissioners. Admit that the journals are the records of the General Assembly, kept in obedience to the constitution. It does not follow that the party claiming any right or defense growing out of the action of the Assembly should plead the entire journals at the court, by way of error. But when the facts relied upon are brought before us judicially, it will be our duty to inspect them as we would any other record, and determine whether the legislative action they record on the bill in question, is in accordance with the constitution (4).

It is said *arguendo* in *Purdy* v. *The People*, 4 Hill, 384, that *nul tiel record* cannot be pleaded to a statute; and in support of this position several *English* authorities are cited. This is undoubtedly the *English* doctrine, growing out of their peculiar institutions. Their law-making power is omnipotent. Not only the common statute law governing the ordinary relations of life, but the *British* constitution itself, is the creature of parliament. In this country legislative bodies are created by the constitution. Thus, every act may be tested by that instrument, and declared void if not in conformity to its requirements. Hence the reason why *nul tiel statute* cannot be pleaded in *England*, can have no application under our institutions (5).

It is clearly as much the duty of the courts to protect one part of the constitution as another. It is all equally sacred and obligatory. Thus, the constitution prohibits legislation of a particular kind on certain subjects, such as regulating the practice in courts of justice, art. 4, s. 22, and requires all laws to be enacted in a particular way, by the vote of a majority of all the members elected to each house. The courts daily determine the one class of questions—why not the other? The only difference is in the mode of presenting them to the court. If the provisions of the law are in conflict with the constitution, the court will notice that judicially. If the defect

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

is in the mode of its passage, that must be presented like any other matter of which the courts do not take judicial notice.

Without suggesting how such grave questions should be brought up, we simply decide that they cannot be considered on a bare assignment of error, as in the case at bar. It is safe to follow the ordinary practice in analagous questions. If the journals of the Assembly are records, let them be treated in the courts like other records.

Besides, the transcript should show that the question here agitated had been properly submitted to the Court below, and adjudicated. *Priddy* v. *Dodd*, 4 Ind. R. 84.

A question of such vital moment as that of going behind the statute, we willingly permit to slumber till circumstances make it our judicial duty to give the answer.

*Per Curiam.*—The judgment is affirmed with 3 per cent. damages and costs.

*M. M. Ray*, for the appellant.

*T. A. McFarland*, in brief, *W. J. Peaslee*, in the oral argument, for the appellee.

(1) *Vide*, also, *Thomas* v. *Dakin*, 22 Wend. 9; *Warner* v. *Beers*, 23 *id.* 103; *Hunt* v. *Van Alstyne*, 25 *id.* 606; *De Bow* v. *The People*, 1 Denio, 9; *The Commercial Bank of Buffalo* v. *Sparrow*, 2 *id.* 97.

In *The People* v. *Purdy*, 2 Hill, 31, Mr. Justice BRONSON said: "But it is said that the act of 1840 [annulling the power conferred upon aldermen in the city of *New York* by the charter of 1830, to officiate as judges of the Court of General Sessions] did not receive the assent of two-thirds of the members elected to each branch of the legislature, and consequently that it is not a valid law. The fact that it did not have the vote of two-thirds of the members, was conceded in argument; and we see from the journals, that only one-half of the Senators, and less than half of the members, voted for the bill on the final passage. How a question like this shall be tried, or whether it shall be tried at all, when a bill has gone through all the usual forms of legislation, are questions which were not considered in *Thomas* v. *Dakin*. They are now presented to this Court for the first time. It has not been denied that the judicial tribunals of the State may, in some way, look beyond the printed statute-book, for the purpose of ascertaining whether bills coming within the two-thirds clause of the constitution, have received the requisite number of votes: and although I have felt a good deal of difficulty on that ques-

tion, I am·inclined to the opinion that such an inquiry may be instituted. The question is, no doubt, one of great delicacy; but if the Court have the right to entertain it, the duty is imperative, and we are not at liberty to shrink from its performance.  We live under a government of laws, reaching as well to the legislative as to the other branches of the government; and if we wish to uphold and perpetuate free institutions, we must maintain a vigilant watch against all encroachments of power, whether arising from mistake or design, and from whatever source they proceed.  The constitution is explicit in its terms, and in a particular class of cases upon which the legislature may act, it denies to a bare majority of the members the power which in other cases they undeniably possess.  To give efficiency to this provision, and secure the people against the exercise of powers which they have not granted, we must, I think, when called upon to do so, look beyond the printed statute-book, and inquire whether bills creating or altering corporations have received the requisite number of votes."

In *Fowler* v. *Pierce*, 2 California R. on p. 168, Murray, C. J. said: "We are called upon to decide whether the courts of the land, to whom belong the guardianship and exposition of the laws and constitution, have power to go behind the act itself to inquire whether the legislature, or the executive as a component part of the legislative power, have, in passing or approving such act, violated or disregarded the mode pointed out by the organic law of the land.  It may be well to remark here, that the rule laid down on the subject of parol evidence, is entirely foreign to this case, and only applies to written contracts between the parties: so that if a legislative act cannot be impeached, it is in consequence of the high dignity and supposed absolute verity of the record, and not because of the rule referred to.  In fact, if a court cannot resort to parol evidence in such cases, the door to all inquiry is closed, as it is impossible, from the nature of the case, to obtain any other evidence in most cases that may arise.  I am of opinion that there is no difference between declaring a law unconstitutional for matters patent upon its face, though passed regularly, and a law apparently good, yet passed in violation of those rules which the constitution has imposed for the protection of the rights and liberties of the citizen.  If such matters cannot be inquired into, the wholesome restrictions which the constitution imposes on legislative and executive action become a dead letter, and courts would be compelled to administer laws made in violation of private and public rights, without power to interpose.  The fact that the law-making power is limited by rules of government, and its acts receive judicial exposition from the courts, carries with it, by implication, the power of inquiring how far those exercising the law-making power have proceeded constitutionally. The weight and character of the testimony necessary to disprove the record may be difficult to determine; but once possessing the power, the Court must proceed according to known rules."

. In *The People* v. *The Supervisors*, &c., 4 Selden, 317, Willard, J. said: "Where the objection to the validity of a law springs out of the failure of the legislature to comply with the provisions of the constitution,

Nov. Term,
1856.

Coleman
v.
Dobbins.

which is not apparent upon the act itself, it should be distinctly set forth in the pleadings, or in this case, in the return. The adverse party should have an opportunity to controvert the allegation, and to prove a due conformity on the part of the legislature with the requirement of the constitution. The legal presumption is that a law published under the authority of the government, was correctly passed, so far at least as relates to matters of form." After some remarks applicable to the peculiar features of the case in hand, he continued: "While this law did not require for its passage the presence of three-fifths to form a quorum, it required like other laws, that the question on its final passage should be taken by yeas and nays, and that they should be duly entered on the journals. It has never been the practice for the presiding officers to certify that these directions of the constitution were complied with. The presumption is that they were, and in my judgment it is not admissible to prove the contrary in any case, and certainly not where the pleadings have not tendered an issue on that fact.

    ✻    ✻    ✻    ✻    ✻    ✻    ✻    ✻    ✻    ✻    ✻    ✻

"Again, the provision of the constitution requiring the question upon the final passage of a bill to be taken immediately upon its last reading, and the yeas and nays to be entered on the journal, is only directory to the legislature. There is no clause declaring the act to be void if this direction be not followed. It does not stand on the same footing with the requirement of a certain number to form a quorum, or to pass a bill. In the latter case there is a defect of power if the requisite number be not present and voting."

To these cases may be added an extract from a late opinion of Attorney General BLACK, in the matter of the claim of Hon. *R. W. Thompson.* The following is his language:

"We cannot go behind the written law itself, for the purpose of ascertaining what the law is. An act of Congress examined and prepared by the proper officers, approved by the president and enrolled in the Department of State, cannot afterwards be impugned by evidence to alter and contradict it. It imparts the absolute verity of a record, at least in so far that no extrinsic proof can be received to erase one thing from it, or to interpolate another into it. If there be an apparent conflict between the journals and the law, as finally approved and enrolled, the journals have no claim to superior authenticity. It certainly has happened very often, and may happen any day, that a clerk neglects to note down the result of a vote which strikes out a clause or a section from a bill in its passage. On the strength of such a hiatus in the journals, who would say that the section stricken out should be considered part of the law after it is passed and and enrolled? If the law is to be looked for in the journals, the president ought to examine all the journals of both houses before he approves a bill; for they may contain evidence of provisions which are not in the bill, and which he would not approve of. But this mode of finding laws in the journals would make enactments neither approved by the executive nor passed by the constitutional majority of two-thirds. This is not all. If the law may be changed by reference to the

journals, any other evidence, written or parol, may be received for the same purpose. An act of Congress which has gone through all the forms of the constitution and is authenticated according to law, may afterwards be mended or marred by the testimony of any spectator who happened to be present when it passed. What is in, or what is not in a statute, must then be a question as open to contradictory proof on both sides, as the terms of a horse trade. And who shall decide such disputes when they arise? The judiciary. It would be a new service to the judges; but perhaps with the aid of juries, and some enlargement of equity powers, to perpetuate testimony, a sort of justice might be accomplished in some cases with a great deal of trouble. But an executive or ministerial officer wanting those aids in the investigation of truth, would often be obliged to decide at random. We must take the acts of Congress as we find them, without addition or diminution. The rule is so obviously necessary, that no other has been ever seriously proposed."

(2) *Miller* v. *The State*, 3 Ohio State R. 475, is a case very similar to that here supposed. The case seems to have been very ably argued, and very thoroughly considered by the Court. In delivering the opinion of the Court, THURMAN, C. J. said: "By the 16th section of the 2d article of the constitution it is provided, among other things, in reference to legislative proceedings, that 'every bill shall be fully and distinctly read, on three different days, unless, in case of urgency, three-fourths of the house in which it shall be pending, shall dispense with this rule.' And 'no bill shall contain more than one subject, which shall be clearly expressed in its title.'

❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋

".Assuming, for the present, without so deciding, that this question arises upon the records, and that the journals of the Assembly may be looked at to ascertain the facts, I come at once to the questions, what are the facts? and what is their effect upon the validity of the act? The facts supposed to be material, are, that the bill originally introduced, after being read twice, and on different days, was committed to a select committee, who reported it back with one amendment, to-wit: 'Strike out all after the enacting clause, and insert a new bill;' that on a subsequent day (*April* 12), this amendment, after being itself amended, was agreed to, and the bill as amended, ordered to be engrossed and read a third time to-morrow; that on the morrow, (*April* 13), it was 'read the third time' and passed, and having afterwards passed the house, and been duly enrolled, was signed by the presiding officers of the two houses, filed in the proper office, and published among the laws.

❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋    ❋

"Now, presumptions are every day made to support the proceedings of the courts, far more liberal than would be a presumption that this so called 'new bill' was read on three days; and it is difficult to perceive why the proceedings of the Assembly are not entitled to as much favor as the doings of the courts. The latter are as much bound as the former to keep a record, or journal, and no one will pretend that legislative records should be more full and perfect than judicial. If a strict,

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

literal compliance with every constitutional requirement, however minute, is necessary to the validity of a law, and the courts are bound to hold that nothing was done but what appears in the legislative journals, it is easy to demonstrate that not a single statute enacted since the constitution took effect, can be upheld. It is no where stated in the journals that any reading of a bill was full and distinct, although the constitution requires that every reading shall be so. But surely this omission does not vitiate every act that has been passed, and make it the duty of the courts to hold them null and void. Everybody, I suppose, would admit that the reading being stated, the fulness and distinctness thereof may be presumed. If so, why may not three readings, and on different days, be presumed, when to do so contradicts nothing in the journal, but, on the contrary, is entirely consistent with it?

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"But inasmuch as the amendment in this case is styled in the journal a 'new bill,' it is said that three readings were necessary. Why necessary? The amendment was none the less an amendment because of the name given it. It is not unusual, in parliamentary proceedings, to amend a bill by striking out all after the enacting clause and inserting a new bill. Jeff. Manual, s. 35. When the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days; but when there is no such vital alteration, three readings of the amendment are not required.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Neither bill nor amendment is spread upon the journal, and unless we were to run into the absurdity of receiving parol proof, and trying the validity of a statute upon the testimony of witnesses, we could not say that any substantial change was made.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Nor is it to be forgotten that every reasonable intendment is to be made in favor of the proceedings of the legislature. It is not to be presumed that the Assembly, or either house of it, has violated the constitution; when, therefore, it appears by the journals that a bill was amended by striking out all after the enacting clause, and inserting a 'new bill,' so called, and but one reading after the amendment is recorded, it cannot be presumed that the matter inserted was upon a different subject from that stricken out, especially when the matter inserted is consistent with the title borne by the bill before the amendment. This is the more obvious and reasonable since the constitution provides that 'No bill shall contain more than one subject, which shall be clearly expressed in its title.'

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"That the power to make laws is vested in the Assembly alone, and that no act has any force that was not passed by the number of votes required by the constitution, are nearly, or quite, self-evident propositions. These essentials relate to the authority by which, rather than to the mode in which laws are to be made.

"Now to secure the careful exercise of this power, and for other good reasons, the constitution prescribes or recognizes certain things to be done in the enactment of laws, which things form a course or mode of legislative procedure. Thus we find, *inter alia,* the provision before quoted. · · · ·. · · This is an important provision without doubt; but nevertheless there is much reason for saying that it is merely directory in its character, and that its observance by the Assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts. Any other construction, we incline to think, would lead to very absurd and alarming consequences.

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    .\*    \*

"But whether the constitution, in the particular under consideration, is merely directory or not, it cannot be gainsayed, it seems to us, that where the journals show that a bill was passed, and there is nothing in them to show that it was not read as the constitution requires, the presumption is that it was so read, and this presumption is not liable to be rebutted by proof. If it be said, as was said in the argument, that this leaves the Assembly at liberty to disregard the constitution, the answer is obvious, that a disposition to disregard it is no more to be imputed to the legislative than to the judicial department of the government, and ought not to be imputed to either. The members of both departments take an oath to support that instrument, and we are not liberty to assume that the sense of duty, and of the obligation of an oath, is weaker in the one than in the other."

(3) The language of Prof. GREENLEAF is: "Notice is taken by all tribunals, of · · · · · · the sittings of the legislature, and its established and usual course of proceeding; the privileges of its members, but not the transactions on its journals." The cases cited in support of the text are: *Lake* v. *King,* 1 Saund. 131; *Birt* v. *Rothwell,* 1 Ld. Raym. 210, 343; *Rex* v. *Wilde,* 1 Lev. 296; 1 Doug. 97, n. 41; *Rex* v. *Arundel,* Hob. 109, 110, 111; *Rex* v. *Knollys,* 1 Ld. Raym. 10, 15, *Stockdale* v. *Hansard,* 7 C. and P. 731; 9 Ad. and El. 1; 11 *id.* 253; *Sheriff* of *Middlesex's* case, *id.* 273; *Cassidy* v. *Stewart,* 7 M. and G. 437.

*Lake* v. *King* was an action upon the case for printing a false and scandalous petition to a committee of the House of Commons, and delivering copies thereof to the members of the committee. "And this case was often times debated. · · · · · · And the defendant principally insisted upon the order and course of proceedings in Parliament, which allow the printing and delivering of petitions and cases depending in Parliament, or before any committee thereof. And, as *Coleman,* a member of Parliament, said at the bar, that when it was a question in the House of Commons, whether it should be allowed to print and deliver copies of petitions and cases to members of Parliament, it was resolved in the affirmative, that they should be so allowed. And of the order of proceedings of Parliament and their committees the Court will take judicial notice.

"And after this case had depended twelve terms, now this term [Hil. 19 and 20 Car. II. Regis.] judgment was given for the defendant by

Nov. Term,
1856.

COLEMAN
v.
DOBBINS.

HALE, chief justice, TWYSDEN and RAINSFORD, upon this point, namely, that it was the order and course of proceedings in Parliament to print and deliver copies, &c., whereof they ought to take judicial notice."

In *Birt* v. *Rothwell*, the Court said: "Now the courts at *Westminster* ought to take notice of the beginning of all Parliaments." And it did accordingly arrest judgment on account of the mistatement of the place of holding the Parliament at which the statute relied upon in the declaration was made.

In *Rex* v. *Wilde*, *per Curiam:* "The Court is obliged to take notice of the commencement of Parliaments, and also of prorogations and sessions." This case was precisely similar to *Birt* v. *Rothwell*.

In *Rex* v. *Arundel*, Ld. HOBART said: "But now suppose the journal were every way full and perfect, yet it hath no power to satisfy, destroy or weaken the act, which being a high record must be tried only by itself, *teste meipso*. Now journals are no records, but remembrances of forms of proceedings to the record; They are not of necessity, neither have they always been. They are like the dockets of the pronotaries, or the particular to the King's patents. The last intended Parliament, 10 Jac., if you be judged by the journal, it was a large and well occupied Parliament, yet because no act passed, nor record is of it, it was resolved by all the judges to be no Parliament. 1 Ro. 29, p. 1, Hutt. 61.

"The journal is of good use for the observation of the generalty, and materialty of proceedings and deliberations as to the three readings of any bill, the intercourses between the two Houses, and the like; but when the act is passed, the journal is expired."

In *Rex* v. *Knollys*, Ld. HOLT said that the "journals are not records of Parliament, and therefore we cannot take notice of them," and cited Hob. *supra*.

*Stockdale* v. *Hansard*, reported in 7 C. and P. 731, and 9 Ad. and El. 1; the *Sheriff of Middlesex's* case, 11 Ad and El. 80, Philad. ed., and *Cassidy* v. *Stewart*, 2 M. and G. 437, refer to the privileges of Parliament and its members, and seem to have no bearing upon the questions in this case.

(4) As to how much the journals or parol testimony ought to weigh in evidence against the validity of the statute, see the remarks of the chief justice, in *Hunt* v. *Van Alstyne*, 25 Wend. 606, and the conflicting opinions of senators FRANKLIN and PAIGE in *Purdy* v. *The People*, 4 Hill, 384; PERKINS, J. in *Skinner . Deming*, 2 Ind. R. on p. 560; and MURRAY, C. J. in *Fowler* v. *Pierce, supra. Vide*, also, *The People* v. *The Supervisors*, &c., 4 Selden, on p. 329; 5 Ohio R. 363; 3 Ohio State R. on p. 482.

(5) Senator PAIGE, in that case, p. 394 said: "We have a right, I think to go behind the printed statute book in order to ascertain whether bills have been constitutionally passed. Judges, who are bound to take notice of a public act, must determine this question by an inspection of the record; for *nul tiel record* cannot be pleaded to a statute." Senator FRANKLIN was of the same opinion, p. 404. The authorities cited are, Dwarr. on Stat. 630, 665; 8 Coke's R. 28; *Rex* v. *Robotham*, 3 Burr. 1472.

In *Warner* v. *Beers*, and *Bolander* v. *Stevens*, 23 Wend. 103, Senator

VERPLANCK held that the doctrine of Lord Coke, "that against a general act of Parliament, or such an act whereof the judges ought *ex officio* to take notice, *nul tiel record* cannot be pleaded, applied to an act of our legislature. That it was the duty of the Court, without the intervention of a jury, to inform themselves as to the legal existence of a statute the best way they could, by reference to the journals of the legislature, by adverting to uncontradicted contemporaneous public history, and by inspection of the statute in manuscript in the secretary's office."