HON. JAMES E. WYCHE........................... DO     DO

RICHARD LANE................................. CLERK.

## THE SEAT OF GOVERNMENT CASE.

The legislature, in enacting that the Seat of Government for the Territory, shall be and remain at Vancouver, exceeded the power conferred upon it by the Organic Act, to "change" said Seat of Government.

The act of the legislature declaring that "Vancouver shall be, and remain the Seat of Government," is made contingent, by the act of the same session of the legislature, submitting to the people, to vote as to their choice of place for said Seat of Government.

An act of the legislature without an enacting clause, and without date, is void.

WYCHE, Justice, dissenting held: That an enacting style adds nothing to the meaning of a legislative act; is of value in construing the act, and therefore not essential to its validity, unless required by organic law; by a rule of the legislature, or by custom; and that none of said requirements obtain in this Territory; that the act making Vancouver the Seat of Government is a proper matter of legislation, and valid; that the act submitting the choice of places, to a vote of the people, is not in *pari materia* with the former act, and in no wise affects it.

The organic act requires that the Supreme Court be held at the seat of government of the Territory. The December term, 1861, convened at Olympia. A plea in abatement of a writ of error was interposed, on the ground that since the passage of the act of Dec. 11, 1860, set out in the opinion, Vancouver had become the seat of government. The question involved in the plea, affecting alike all cases upon the docket, by agreement of counsel, and consent of the Court, its decision was made decisive in all.

Opinion by Oliphant, Associate Justice.

This is a grave and important question. It comes before us laden and freighted with high national, territorial and individual interests, and it has been argued on both sides with marked ability. The issue arises by virtue of certain acts of the territorial legislative assembly, passed at the session of 1860 and 1861, and contained in the printed laws of those years. There is no dispute as to any discrepency between the printed and the enrolled laws remaining in the office of the secretary of the Territory. These laws are as follows, viz:

"An Act to Permanently Locate the Seat of Government for the Territory of Washington.

"Sec. 1. From and after the passage of this act, the seat of government for the Territory of Washington, shall be, and remain at the city of Vancouver, in Clarke county.

"Sec. 2. The Capitol commissioners are hereby empowered and directed to locate the grounds and erect the Capitol buildings thereon, at the city of Vancouver, according to the instructions from the government of the United states, and the laws of this Territory, in relation thereto.

"Sec. 3. The present session of the legislative assembly shall remain at Olympia until the close thereof.

Lyman Shaffer,
*Speaker of the House of Representatives.*
Paul K. Hubbs,
*President of the Council.*"

"*The Legislative Assembly of the Territory of Washington do enact as follows:*

"Sec. 1. The qualified voters of the Territory of Washington, at the next annual election, are hereby requested to vote in their respective precincts, naming their choice of the place of location of the seat of government for said Territory.

"Sec. 2. In voting, it shall be sufficient to print or write the name of the place so designated as the choice of the person voting, as 'Olympia,' 'Vancouver,' or any other place, in accordance with the preference of the voter.

"SEC. 3. The judges of election shall cause to be counted the said votes, and due return make thereof, in the same manner as returns are made for delegate to Congress, and the governor shall publish by proclamation, immediately after the returns are made, the number of votes given for each place voted for.

LYMAN SHAFFER,

*Speaker of the House of Representatives,*

PAUL K. HUBBS,

*President of the Council.*"

The first of these acts comes to us "in such a questionable shape," that we "must speak," at least, of it. It is born into the world without date, without an enacting clause, and without paternity. Owing to this *anomalous* legislation, this Court is placed in the position of finding out and determining as best it can, where is the seat of government of Washington Territory, thus changing the *phase* of its *ambulatory* character, and giving to it a "local habitation and a name."

This Territory owes its existence to what is called the "Organic Act," passed by Congress the 2d of March, 1853.

The portions of that act bearing on this case, are contained in sections four, nine, and thirteen. By section four, the legislative power is "vested in a legislative assembly, to consist of a Council and House of Representatives." The same section fixes the number of each, and the manner of their election. By section nine, the Judicial power is vested in a Supreme Court, District Courts, Probate Courts, and Justices of the Peace. The Supreme Court, as the act in this section further declares, is to consist of a Chief Justice, and two Associate Justices, and shall hold a term annually, at the "seat of government." Section thirteen enacts "that the legislative assembly of Washington Territory shall hold its first session, at the time and place in said Territory, as the Governor shall appoint and direct; and at the said first session, or as soon thereafter as they shall deem expedient, the legislative assembly shall proceed to locate and establish the seat of government, at such place as they may deem

eligible, which place, however, shall thereafter be subject to be changed by said legislative assembly." The same act appropriates the sum of "five thousand dollars for the erection of public buildings at the seat of government."

The first legislative assembly did not, as it seems, avail themselves of the powers granted to them by Congress, to "locate and establish" the seat of government for the Territory. It was, however, subsequently, in the year 1855, located and established by the legislative assembly, at Olympia. After this location, Congress, at its session of 1856 and '57, made an appropriation of thirty thousand dollars, for the erection of a Capitol, etc.

Commissioners were appointed by the Territorial legislature, and a portion of the money has been expended in pursuance of the provisions of this act of Congress.

This is a brief outline of the first branch of the history of what is termed the "*Capital case,*" by the citizens of this Territory.

At the same session of the legislative assembly, the act called, in common parlance, "the submission to the vote of the people act," was passed. On our arrival in the Territory, with these two acts on the statute book, with their apparent imperfections, inconsistency and repugnance, it was impossible to close our eyes to the fact that if matters remained as herein stated, without further legislation, the question of the removal of the "seat of government" for Washington Territory would come before and have to be passed upon, by the Supreme Court, in some way, and at some place. It has been *forced* upon us, and we have not shrunk from the responsibility of its decision. In our opinion, Olympia was *prima facie* the seat of government. Here were the Capitol buildings, the archives of the government, the library, and here also, before the close of the first week in December, 1861, were assembled an *unorganized quorum,* awaiting the action of the Supreme Court, of the council and house of representatives. At Olympia the Court was opened in due form, all the Judges being present. Upon calling

the case above stated, (*Rodolph vs. Mayer et al.*,) the plea to the jurisdiction is interposed. To dispose of that plea, in which were embarked the interests of all parties on the docket, the entire merits of the public question involved in the controversy have been passed in review before the Court, and occupied more than three entire days in the discussion. This is the second branch of the history of this case.

A conflict of opinion between the legislative and judicial branches of the government is always to be regretted. Both have separate and distinct duties to perform. The one makes, the other expounds the law when made. An act may be passed and published by legislatures, national, state, and territorial, with all the usual formalities and appendages, and yet pronounced no law when put to the judicial test. Such is the fate of all laws considered by Courts unconstitutional, on account of their being *ex post facto*, impairing the obligation of contracts, or otherwise. If, therefore, *an enactment*, upon a full examination by the Court, aided by the research and argument of learned counsel, be found, in the opinion of the Court competent to try the question, to be either unconstitutional, or wanting in the requisite elements to give vitality, force and power, that Court, (humble as may be its pretentions,) is bound to declare it void, and of no binding effect as a "rule of action," or of "civil conduct."

It is urged by the counsel sustaining the plea to the jurisdiction, that this act is one of construction, and if from its provisions, and other outward attractions and sanctities, the intention of the legislative assembly of the Territory be palpably manifest, then it must be enforced, and the seat of power of this Court is at Vancouver, and not at Olympia. The counsel in opposition to the plea entered, contend that it is not a law, or, in other words, that it is void *per se*, wanting all the requisites to give it vitality as a law.

While the *title*, or *preamble*, to an act is no part of the act itself, it is a well settled rule of law, that resort may be had to both, by Courts, in determining what was the intention of the

legislature, as attempted to be conveyed through the body of the act. Here there is no *preamble*. The *purview* and *title* of this act substantially agree. What aid then do we derive from the title? Like "vaulting ambition, it has o'erleaped itself," and passed beyond the barriers erected by the organic act to restrain within proper limits, legislative action. The organic act, called with emphasis the constitution of the Territory, confers only on the legislative assembly the power to "change" the seat of government, not to "permanently locate," as is declared in both the title, and the body of the act. In the latter, the words are, "that from and after the passage of this act, the seat of government for the Territory of Washington *shall be and remain* at the city of Vancouver, in Clarke county."

The time of the passage of the act, is not disputed. The date is admitted in the argument to be the 11th of December, 1860. Where, then, after this date, was the seat of government for Washington Territory, if this act has the force and validity of law? Manifestly at the city of Vancouver. It is at the seat of government that the Supreme Court is required by the organic act, to hold its sessions. It was not so done. The session of the Supreme Court for 1860, as their record shows, was holden at Olympia, business transacted, and decrees made, from the 11th of December to the 22d of December of the same year.

· This fact is not introduced for the purpose of casting any reflections upon that learned and honorable Court, but for the object of showing that this act was considered, practically at least, by that tribunal, of no binding effect.

At the same session, the act "*requesting*" the vote of the people as to their choice as to locating the "seat of government" was passed by the legislative assembly. The qualified voters did, by vote, express their choice, in the way and manner pointed out by the act. The majority of the votes cast indicated and made known as directed in section three, was in favor of Olympia. Now this act certainly meant something. It is hardly to be presumed that grave and wise legislators would, under

the forms and apparent sanction of law, call upon their constituents to do an act, the result of which was to be an idle and unmeaning ceremony, thus "holding the promise to the ear and breaking it to the hope." Though this act be couched in such terms as to carry with it no binding force, a preference or choice of the people, as to the location of the "seat of government" is invited, and when that preference is expressed, under the forms of law, it is entitled to respect from Courts, as well as legislators. These acts are in *pari materia.* They go hand in hand. They must stand or fall together. Both cannot justly survive. Obey the one, and violence is done to the will of the people; obey the other, and violence is done the legislative will. In a doubtful issue, therefore, of the kind which this legislation presents, a majority of this Court is in favor of giving the people the benefit of that doubt, instead of giving it to their agents and servants. To act otherwise would be to render this and all other Courts undeserving of the eloquent eulogy pronounced upon them by the learned counsellor from Vancouver, as being the shield and ark of safety, in the last resort of those from whom all power emanates.

We are told in the argument of the advocates of this first, or "removal act," that we must not lay profane hands on this legislative idol, and then, almost in the same breath, we are solemnly called upon not only to *disregard* this second act, known as the "vote of the people act," but to blot it from the statute book, and treat it as a species of legislative stultification. The only way these acts can be reconciled, is to give to the legislative assembly in the passage of them, an honest intent. By the first act, the seat of govrenment was to be removed, unless restrained by the popular will. This will, as expressed, in the manner directed, was adverse to removal. Hence we derive from this second act, and the result flowing from it, the fair, strong, and legitimate inference that the seat of government was to remain at Olympia, and that such was the force and effect intended should be given to it by the legislature at the time of its

passage. Any other hypothesis would involve us in an intricacy and inconsistency from which there is no escape.*

Mr. Justice Blackstone defines municipal law to be, "a rule of civil conduct prescribed by the supreme power in a state, commanding what is right, and prohibiting what is wrong." Chancellor Kent, eminent as a jurist, one of the highest legal luminaries of the nation, or the world, on page 493 of his commentaries, defines a statute to be, " the express will of the legislature rendered authentic by certain prescribed forms."

L. N. Cushing, Esq., in his treatise on the law and practice of legislative assemblies, expressly states, that the constitutions of all the states in the Union, with the exception of Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Louisiana, Kentucky, and Arkansas, contain a statement, under the name of the enacting style, of the words with which every act of legislation in those states, respectively, must be introduced, sometimes with, and sometimes without, the use of negative words or equivalent language. The constitutions of the states above named, and of the United States, contain no statement of an enacting clause, *though equally requisite to the validity of a law*, must depend mainly on custom.

" The foregoing considerations," says this author, " seem to call for three remarks:

" 1. Where enacting words are prescribed, nothing can be law which is not introduced by these very words, even though others which are equivalent are at the same time used.

" 2. Where the enacting words are not prescribed by a constitutional provision, the *enacting authority* must, notwithstanding, be stated; and any words which do this to a common understanding, are doubtless sufficient, or the words may be prescribed by rule," Cushing's Law Practice of Legislative Assemblies, 819, 820.

---

*The vote, as published, stands: Whole number of votes cast, 2,315. Olympia, 1,239; Vancouver, 639; Steilacoom, 253; Port Townsend, 72; Walla Walla, 67; Seattle, 23; Port Madison, 2; Cherburg, 3; Port Ludlow, 2; Coveland, 1; Jefferson, 1; Madison, 7; Rockland, 6; Forks of Touchet, 1.

Strip this act of its outside appendages, leave it "solitary and alone," is it possible for any human being to tell by what authority the seat of government of Washington Territory was to be removed from Olympia to Vancouver?

The staring fact that the constitutions of so many states, made and perfected by the wisdom of their greatest legal lights, contain a statement of an enacting clause, in which the power of the enacting authority is incorporated, is to our minds a strong, and powerful argument of its necessity. It is fortified and strengthened by the further fact, that Congress, and the other states, to say nothing of the English Parliament, have, by almost unbroken custom and usage, prefaced all their laws with some set form of words, in which is contained the *enacting authority*. Guided by the authority of such eminent jurists as Blackstone, Kent, and Cushing, and the precedents of national and state legislation, (the practice and rules in making laws being called parliamentary to this day,) this Court arrives with satisfaction and consciousness of right in declaring, that where an act like the one now under consideration, is wanting in the essential formalities and solemnities which have been mentioned, it is inoperative and void, and of no binding force or effect, unless it had been acquiesced in by courts, juries, legislators and people, and rights vested and acquired under it, to such an extent that it would be manifest injustice to disturb them. To decide otherwise, would be to mar the symmetry of the frame-work of legislative enactments as "a rule of action," and to extinguish the "gladsome lights of jurisprudence."

Say not that in this action of the Court it has been governed by a blind adherence to "musty precedent," or glued with too much tenacity to those things which have stamped upon them the rust of ages. Those matters which are essential to the rights and interests of individuals and communities, and which have received the impress and sanction of antiquity, are neither to be contemned, nor slightly regarded. Loosed from such anchorage and moorings, where would be our *habeas corpus* writ, our trial by jury, which have come to us through the lapse of centuries?

As to the power of a territorial legislature to "change" the seat of Government after it has been located and established as directed in the organic act, and an appropriation made by Congress for the erection of the Capitol buildings, and that appropriation expended, in whole or in part, to the purposes designed, without the consent of Congress, this Court expresses no opinion. The point is merely raised.

We have deemed it necessary to notice all the points raised in this issue, and at the same time vindicate the opinion given in a matter that has engrossed and agitated the public mind of the territory to no small extent, for the last year. In doing this, no motives have been impugned, and we have been actuated by no selfish considerations, either as it regards persons or place. As a Court, we have a high, sacred, and sworn duty to perform. As individuals, it is a matter of indifference to us whether the seat of government for Washington Territory be located on the banks of the Columbia river, of "fame historic," the Cowlitz, or Chehalis, in the golden regions beyond the Cascade mountains, or on the shores washed by the waves of the ocean. If we have erred in refusing to give binding force and effect to this act, the consolation remains, that it is in the power of Congress, the territorial legislature, or the Supreme Court of the United States to correct the error, and the disappointed are not without remedy. Plea to the jurisdiction overruled.

---

DISSENTING OPINION BY WYCHE, ASSOCIATE JUSTICE.

Objection having been raised by counsel, to the trial of this case, on the ground that this Court can hold its sessions only at the seat of government, and that Vancouver, and not Olympia, is the seat of government, the Court is called upon to examine an act passed at the last session of the legislature, entitled "an act to permanently locate the seat of government for the Territory of Washington," and to determine whether the act be a valid law. The following are the sections of the act:

"AN ACT TO PERMANENTLY LOCATE THE SEAT OF GOVERNMENT

FOR THE TERRITORY OF WASHINGTON.

"SEC. 1. From and after the passage of this act, the seat of government for the Territory of Washington, shall be, and remain at the city of Vancouver, in Clarke County.

"SEC. 2. The Capitol commissioners are hereby empowered and directed to locate the grounds and erect the Capitol buildings thereon, at the city of Vancouver, according to the instructions from the Government of the United States, and the laws of this Territory, in relation thereto.

"SEC. 3. The present session of the legislative assembly shall remain at Olympia, until the close thereof."

The act is signed by Lyman Shaffer, Jr., Speaker of the House, and Paul K. Hubbs, President of the Council, and has no enacting style, that is to say has not the words: "Be it enacted by the legislative assembly of the Territory of Washington," or any similar words.

It is objected to this act, that it has no enacting style, and that an enacting style being essential to every act, the law is in fact, no law at all, and must be treated as a miscarriage of the legislative assembly. This position, if well taken, disposes of the whole matter, as it leaves no law here for the consideration and construction of this Court. To determine the question of an enacting style, requires, to some extent, an examination into the source and limits of legislative power, and how far these powers are conferred or restrained by constitutional provisions, and a determination also, of the necessity and uses of an enacting style. No case has been cited here, where the necessity of an enacting style has been adjudicated, either in this country or in England, and in discussing the point, I may be considered as treading upon virgin soil, except so far as decisions of analogous principles may be invoked. For this reason the subject is approached with diffidence. The question itself, of the seat of government, is ephemeral in its nature and effects, and the judgment of this Court, whether it declares the seat of govern-

ment at Olympia or Vancouver, can have but a limited influence if any at all, upon the growth and prosperity of the Territory, or cast a cloud over the brighter days dawning upon our people. My chief solicitude in this matter, therefore, is that the opinion I may give, should be a true exposition of law, reposing upon correct principles and solid reason.

The constitutions of nearly all, if not every state, prescribe some *form* for an enacting style, that is to say, some description of the law-making power. ˙ In such statutes it is conceded the prescribed forms must be followed, perhaps literally, at all events, substantially, though a different doctrine has been held by the Supreme Court of California. The constitution of that state requires that "every law enacted by the legislature shall embrace but one object, which shall be expressed in the title," which requirement was held by the Courts of California to be merely directory, and that a law might be valid which did not comply with that provision, 4 Cal., 388. This decision, however, is unsatisfactory, and is not cited with approbation. The organic act of this Territory is, in the main, to the Territory, what a state constitution is to a state, and was so intended by Congress, and is so recognized in all the departments of our territorial government. Now, the organic act neither expressly nor by implication, prescribes or requires any enacting style whatever, and the only requirement in the matter of form is, that " every law shall embrace but one object, and that shall be expressed in the title," sec. 6, organic act. The act may be considered, therefore, as saying to the legislature, " you may pass your laws in such form as you please, provided that any law shall have but one object, and that be expressed in the title." Neither is an enacting style required by the rules adopted by the territorial legislature, nor is there any provision in the Constitution of the United States, nor any law of Congress requiring territorial legislatures to employ an enacting style. The question then, in the absence of such requirement from these sources of power, is an enacting style essential to the validity of an act of our Territorial legislature?.

It will be conceded that an enacting style adds nothing to the sense of the act, and is no aid whatever in ascertaining the intention of the legislature. It neither enlarges nor restrains any provisions of the law, and for the purpose of construction, is worthless. Is there any other reason, then, rendering an enacting style essential to a law, and leaving an act of the legislature powerless without one? The law-making power is the most transcendant in government. "An act of Parliament," says Blackstone, "is the exercise of the highest authority the kingdom acknowledges upon earth;" and Kent says, "if there be no constitutional objection to a statute, it is with us as absolute and uncontrolable as laws flowing from the sovereign power, under any other form of government." The Federal Constitution is a grant of power to Congress, but the state constitutions, and the organic act of this Territory, while grants of powers to other departments of government, are not grants of power, but limitations on the powers of the legislative department, *Fletcher vs. Peck*, 6 Cranch, 87; *Golden vs. Price*, 3 Wash. C. C. R., 313; *Sawyer vs. the City of Alton*, 3 Scam., 127; *the People vs. Wilson*, 15 Ill., 392; 4 Cal, 49.

The legislative power over subjects of legislation, then, is limited only by the constitution, and by certain boundaries of natural equity and reason, which, though undefined, must be conceded to exist. If, therefore, the legislative right to express its will is so vast, why is not its power over the forms in which it clothes that will equally extensive? If it may express its will, why may it not employ such terms to convey that will as it pleases? Words are useful only to convey ideas, and if neither the rules of a legislative body, nor the constitution under which it acts, prescribe any set words in which public laws shall be clothed, the legislature can use any form of words it pleases, and if form enough be used, within the limits above indicated, to enable a Court to ascertain the will of the legislature, that will is the law of the land, and Courts must administer it as such. Any other view of the matter would sacrifice the substance for the shadow.

Legislative precedents in the matter of an enacting style,

have been presented here, both from this country and England, and it is contended, in substance, that inasmuch as we have adopted the common law of the mother country, we have adopted also the old forms and precedents of Parliament. Our fathers brought with them the principles of the common law, as far as applicable to the condition of our country and the genius of our institutions, and claimed them as their birthright; but many of the old forms used in England were never transplanted, and many that were, have perished for want of congenial soil. Nor should ancient precedents and mouldy forms be placed in the scales when public laws and public rights are weighed. Analogies are insisted upon between deeds, wills, etc., and public laws, and it is claimed the same necessity for forms, exist in both, and that the rules of construction are similar. No such analogy of right exists, and the rules for construing deeds between private persons are only to a limited extent applicable to public laws. The Supreme Court of the United States have so held. In second Peters, 661, Justice Story, in delivering the opinion of the Court, says: "For the purpose of giving a construction to the words of the act, we have been referred to the doctrine of confirmation, at the common law, between private persons. It is said the act uses the appropriate words of a deed of confirmation, 'ratify and confirm,' and that a confirmation at common law will not make valid a void estate or act, but only one which is voidable. It is, in our judgment, wholly unnecessary to enter upon any examination of this doctrine of the common law, some of which is of great nicety and strictness, because the present is not an act between private persons, having rights and interests to be operated upon by their deed. This is a legislative act, and is to be interpreted according to the intention of the legislature, apparent upon its face. Every technical rule, as to the construction or force of particular terms, must yield to the clear expression of the paramount will of the legislature." Bouvier defines a statute-law to be the "written will of the legislature, solemnly expressed according to the forms prescribed in the constitution," and no writer upon statute law, perhaps, considers an enacting style any part of the

law. (See Dwarris on statutes, where the various parts of a law are given.) If, however, the legislature of this Territory is compelled to use an enacting style, from the force of custom, that custom must be unbroken. Now, at the first session of the Territorial legislature, the most important act in our statute, the act relative to grand and petit jurors, was passed without an enacting style, as published, and as on file in the office of the secretary. Under this act, destitute of an enacting style, during all our Territorial history, we have, deprived our people, not only of their property, but of their liberty and lives. No protesting voice was raised from the bench or the bar, and nobody supposed the act to be no law, because it had no enacting style; but new light dawns upon a darkened world, and the once worthless enacting style now looms up in grand proportions. To minds learned in the law, satisfactory reasons may suggest themselves, but plain, common folks may well be excused, if shaking their heads, they turn from this matter with doubting minds.

What reason or necessity is there for an enacting style? It has been suggested that it is necessary to show what body enacted the law, and it has been said, if this act under consideration was torn from our statute book, no one, from reading it, could tell whether it was passed in Washington Territory or the Sandwich Islands. Now it must be conceded, that an enacting style, if any evidence on this point, is but presumptive, and that an act might be published among our laws, purporting in the enacting style to have been enacted by the legislative assembly of this Territory, when, in fact, no such law was ever enacted. As, therefore, the presence of an enacting style in a law, does not prove that it was passed by the body described in the enacting style, so the absence of an enacting style is no proof that a law was not passed by any legislative body. The true position of the matter is this: Every law published by authority, among the public laws, will be held by the Courts to have passed, until that fact is questioned, and the Court would not then go to the enacting style to determine the matter, but would resort to the journals of the legislature, to ascertain whether, in fact, such an act was passed.

17

What is the passing of a law by our legislature, and where the proof of its passage? The 4th section of the organic act vests the legislative power in the legislative assembly, consisting of a Council and House, and the passing of an act is the introduction and consideration of it by that assembly, and the assenting or voting for it, by the requisite number of members, when put upon its passage, and, under the rules of the legislature, the engrossing and enrolling of the bill, and signing the same by the speaker of the house, and the president of the council. How is the fact, if questioned, whether a bill was passed, to be determined? The answer is, by going to the office of the secretary, to see if such bill is on file there, and, more especially, going to the journals of the legislature to ascertain from inspection, if such a bill was in fact acted upon, and passed by the legislature. This subject is one of great delicacy, and Courts should proceed with the utmost care in investigations of this character. It is a power, however, essential to justice. By collusion and corruption, an act might be published among the public laws, which in fact had never been acted upon by the legislature, or if so, had been defeated on its passage; and if the Courts could not go behind the statutes, they might be compelled to administer an act as law, which in fact is no law at all. The duty of the Courts to administer the law, embraces the duty to ascertain what is the law, and in such inquiry, the right to go behind the statute is an incident, the exercise of which may be necessary for the protection of public liberties and public rights. Courts of the country have been compelled, though reluctantly, so to hold. The case of *Coleman vs. Dobbins*, 8 Ind., 156, is in point. The constitution of the state requires that "a majority of all the members elected to each house shall be necessary to pass every bill," and that "every bill shall be read by sections, on three several days in each house," and the Supreme Court of that state considered it their right and duty to go behind the statute, to see if a law was passed in accordance with these constitutional provisions. See, also, 2 Hill, 31; 4 Hill, 384; 10 Harris' Penn. Rep., 376; 3 Ohio, 475; 4 Selden, 317; 14 Ill., 113.

The constitution of New York requires bills of a certain class to receive the assent of two-thirds of the members, and in the case in 2 Hill, the Supreme Court of New York held that it could go behind the statute to see if a bill of that class received the constitutional vote, Justice Bronson saying: "To give efficacy to this provision, and secure the people against the exercise of powers which they have not granted, we must, I think, when called on to do so, look beyond the printed statute book, and inquire whether bills creating or altering corporations have received the requisite number of votes." Without going further into these authorities, (and they will be found interesting as discussing delicate and important questions,) it is established, by them, that when the constitution requires an act to be passed by a certain vote, or in a certain manner, the Courts may go behind the printed statute, to ascertain if the act was so passed and if they possess this power, much more do they possess the power when an act is published among the public laws and has no enacting style describing the authority that enacted it, to go to the Journals to ascertain in fact whether such an act was passed, if the fact be called in question. From this conclusion there is no logical escape, and if the position be correct, then no reason exists for an enacting style to show the authority that enacted the law. Such being the case, I may be excused, perhaps, for not bowing to musty forms exhumed here, like Egyptian mummies, for admiration and adoration. Nor have I felt my hands tied by judicial decisions, though I would not be understood, however, as speaking in an irreverent manner of the force of authority, or of that system of laws which have grown up under rulings of the Courts, illumined as it is by the great lights of the law and enriched with the spoils of time.

A brief consideration will be given to other objections urged against the law. It has been contended that, inasmuch as the first section of the act establishes the seat of Government at Vancouver from and after the passage of the act, and the third section declares that the then session should close its labors at Olympia, that the two sections are so repugnant as to destroy the act. Now, there is no room for a reasonable question

on this point, as the matter lies in my mind. "The general words in one clause of a statute, may be restrained by the particular words of a subsequent clause of the same statute."— (Dwarris on Statutes, 21.) "Where a general intention is expressed and the act also expresses a particular intention, incompatible with the general intention, the particular intention is to be considered in the nature of an exception." (Dwarris, 21.) Now these well established rules cover the case, and the Legislature said that Vancouver shall be the seat of Government from the passage of the act, upon the condition that the then session should close its labors at Olympia. It was not only in the power of the Legislature so to frame the law, but highly proper, as it would have been inconvenient to the members and injurious to the public interests to have adjourned over to Vancouver in the midst of the session.

Various rules of construction are laid down in the books and have been discussed in this case, but after all, the chief object of all rules and maxims of interpretation, is to discover the true intention of the law. There is no difficulty in ascertaining the intention in this case, and no such uncertainty and antagonism in the act as to render the law invalid.

It has been argued however, that even if the law be a valid one as it stands, the same Legislature passed at a subsequent day another act, which must be considered as amendatory and explanatory of this act. An examination of the last act shows that it does no more than request the people at the next election thereafter, to express by their vote their preference for the place for seat of Government—whether that place should be Vancouver, Olympia, Walla Walla or any other place in the Territory. At that election, Olympia received a larger vote than any other place—some half a dozen having been voted for. The act, however, does not declare that the place receiving the largest vote shall be the seat of Government, or that the vote shall in any manner affect the law previously passed locating the seat of Government at Vancouver. While it is a well established rule of law, that all acts in "*pari materia*" are to be considered together, this rule will not authorize a Court to give

effect to an act when in fact no such effect can be gathered from the act.   If there was any virtue in the act, the virtue consisted in giving efficacy to the popular will, and if the act had such virtue for Olympia, it possessed it also for Walla Walla or Steilacoom, or any other place in the Territory; but would it be contended, if the popular vote had been in favor of Steilacoom, that that place would have been the seat of Government?   It is said the Court must give some reasonable intent to the Legislature, and if the vote was not intended to determine whether the seat of Government should be moved from Olympia to Vancouver, it had no reasonable purpose.   What the Legislature intended may not be very clear, but it is not unlikely they intended to ascertain the popular will as a guide for subsequent legislation.   As I find, however, no provision in the Organic Act creating this Court into a "guessing school," or no requirement of the kind by our rightful masters, the people, I decline further explorations in that region.

The power of the Legislature to remove the seat of Government has been questioned, but the Organic Act is too clear for discussion.

Neither is an examination necessary of the question as to the proper place for holding this Court.   The Organic Act says it must be held at the seat of Government, and the seat of Government is the place where the functions of the State officers are performed, and more especially the place where the law-making power may legally assemble to enact laws.   As in the view here taken, the law moving the seat of Government to Vancouver is a valid law, and Vancouver, and not Olympia, is the seat of Government for Washington Territory, this Court has no authority to try cases at this place, and should adjourn to Vancouver to transact such business as may be submitted to it.