EVANS, Auditor of State, v. BROWNE.

STATUTE.—*Judicial Cognizance of.*—The courts of this State must take judicial notice of what is and what is not the public statutory law of the State.

SAME.—*Limit of Judicial Inquiry.*— *Official Authentication.*—Where a statute is authenticated by the signatures of the presiding officers of the two houses of the legislature, the courts will not search further, to ascertain whether such facts existed as gave constitutional warrant to those officers to thus authenticate the act as having received legislative sanction in such manner as to give it the force of law.

APPEAL from the Marion Common Pleas.

The appellee was the plaintiff below, and filed his complaint under oath, alleging, that by an act of the General Assembly of the State of Indiana, passed at the special session thereof in the year 1869, entitled, "An act making specific appropriations for the year one thousand eight hundred and sixty-nine and eighteen hundred and seventy," which act was in full force and effect on the 24th day of May, 1869, and from that time hitherto; it was, among other things, enacted as follows: " Sec. 17.   That Thomas M. Browne be allowed the sum of fifteen hundred dollars, for services as attorney .to the Morgan Raid Commission, by appointment from Governor Baker, as provided for in the concurrent resolutions of the General Assembly of the State of Indiana, for the year 1867;" that on the 24th day of May, 1869, the plaintiff, said Thomas M. Browne, demanded of the defendant, John D. Evans, Auditor of State, at the office of the Auditor of State, in the city of Indianapolis, that he draw a warrant as such Auditor of State, in favor of the plaintiff on the Treasurer of State of the State of Indiana, for the said sum of fifteen hundred dollars, due and payable to him out of the Treasury of the State of Indiana, by said act; that said Evans, as such Auditor of State, utterly refused to issue or draw said warrant, and still refuses.   Prayer for a writ of mandate directed to, commanding, and requiring said Evans, as such Auditor of State, to issue and draw said warrant for fifteen hundred

dollars upon the Treasurer of State in favor of the plaintiff, without delay.

The defendant answered in one paragraph, admitting the said allowance to the plaintiff, by said act, as stated in the complaint, but charging that said act did not become a law × of the land, binding and justifying the defendant in acting under the same by drawing his official warrant on the Treasury for the several sums of money therein appropriated, for the reason that said bill, after its passage in the House of Representatives, was reported, in conformity to usage, to the Senate for its action, and was by the Senate amended in many important particulars, by the addition of many new sections, making additional appropriations; that the bill thus amended was returned to the House, and before the amendments so made by the Senate were considered and acted on by the House, forty-two members of said House of Representatives resigned their offices as members of said House, by presenting and delivering to the Governor of the State their resignations in writing, which were filed with the Governor on the 13th day of May, 1869, thereby then and there destroying the capacity and power of said House of Representatives to legislate and transact business coming before it as one of the branches of the General Assembly of Indiana, reducing the number of its members below sixty-seven, its constitutional quorum, to wit, to fifty-eight; that afterwards, on the 14th day of May, 1869, said House, without said constitutional quorum, concurred in the several amendments of the Senate, and finally passed said bill; that on the same day, the 14th of May, 1869, but not until after said concurrence and passage had taken place, the Governor officially communicated to the House information of the fact that forty-two members of said House had, on the 13th day of May, 1869, so resigned; and hence, that said bill did not, under the forms of the Constitution and in accordance with its requirements, become a law.

To this answer the plaintiff demurred; the demurrer was

overruled, and the plaintiff excepted. Reply in two paragraphs:—

First, the general denial.

Second, that on the 13th day of May, 1859, the day before the amendments of the Senate were concurred in, there was had a call of the House, and ninety members were present and answered to their names; that there was a quorum of the members of said House present at the time of the concurrence by the House in the amendments of the Senate to said bill, as appears by the journal of the proceedings of the House. A copy of the journal of the House for the 13th of May, and for the 14th of May up to the time when the Senate amendments were concurred in, is made a part of the reply.

The copy of the journal of the House for the 13th of May, 1869, shows that the House met; that upon a call of the House fifty-one members answered to their names; that the House ordered that the absentees be sent for; that the House adjourned, by a vote of thirty-six to fifteen; that at two o'clock in the afternoon the House met; that a call of the House was had, and ninety members answered to their names; that a motion to lay upon the table a motion to dispense with the further proceedings under the call was disagreed to—ayes, fifteen; noes, fifty-five; that sundry resolutions were passed; that upon a vote on the motion to lay on the table the motion to dispense with the further proceedings under the call, there were fifty-two ayes and three noes; and that the House adjourned.

The copy of the journal of the House for the 14th day of May, filed with the reply, shows that the House met; that on motion, the reading of the journal of May 13th was dispensed with; that a motion for a call of the House was disagreed to; that the House adjourned; that the House met at two o'clock in the afternoon; that on motion, the House took up the message of the Senate containing amendments to the Specific Appropriation Bill; that the message with the amendments was entered upon the journal; that

the question being on concurring in the amendments, it was agreed to; that a motion to reconsider the vote concurring in the amendments was laid on the table.

The defendant demurred to the reply, alleging for cause, "that the facts therein stated do not constitute a reply to the facts set up in defendant's answer, and that they are not sufficient in law to justify the order of mandate herein against the defendant."

The demurrer was overruled, and the defendant excepted.

By agreement, the cause was tried by the court. There was a finding for the plaintiff, and it was ordered that the writ of mandate issue against the defendant.

The defendant moved for a new trial, and filed his reasons therefor, as follows:—

"1. The finding, judgment, and order of said court are not sustained by sufficient evidence.

"2. The finding, judgment, and order of said court are contrary to law."

The motion was overruled, and the defendant excepted, and filed his bill of exceptions.

On the trial, the plaintiff proved his demand on the 24th of May, 1869, at the office of the defendant, in Indianapolis, and the refusal of the defendant to issue the warrant.

The defendant admitted that the copy of the journal of the House filed with the reply was a true copy of the original journal of the House of the 13th and 14th of May, up to the time of the concurrence of the House in the Senate amendments; and the copy was introduced in evidence by the plaintiff.

The defendant admitted the allowance of fifteen hundred dollars to the plaintiff by said specific appropriation bill.

In addition to the evidence contained in the bill of exceptions, a certified copy of a message of the Governor is by agreement made part of the evidence and attached to the record. By this message, the Governor communicated to the House, that forty-two members thereof (naming them) presented and delivered to him their resignations as such

members, on the 13th of May, 1869; and it is agreed that this message was transmitted by the Governor, through the Speaker, to the House, on the 14th of May, 1869, after the House had concurred in the amendments of the Senate to the specific appropriation bill.

Prefixed to the enrolled act filed in the office of the Secretary of State, is the following statement:—

"House bill No. 311, hereto attached, entitled, 'An act making specific appropriations for the year one thousand eight hundred and sixty-nine, and eighteen hundred and seventy,' having been presented to me on the 15th day of May, 1869, and the final adjournment of the General Assembly having taken place on the 17th day of May, 1869, and said act not having been approved and signed by me, and not having been filed in the office of the Secretary of State with my objections thereto within five days after said adjournment, said act therefore took effect, under the constitution, without executive approval, on the 22d day of May, 1869; and in now filing it in the office of the Secretary of State, I deem it my duty to accompany it with a statement of facts as to the manner of its passage. The bill having regularly passed the House, was reported to the Senate, and was amended in many material particulars by the Senate, by the addition of many new sections making additional appropriations. Thus amended, the bill was returned to the House, and before the amendments so made by the Senate were considered by the House, forty-two members of the House resigned their offices as members of the House of Representatives, by presenting and delivering to the Governor their resignations in writing. These resignations were made on the 13th day of May, 1869, and afterwards, on the 14th day of May, 1869, the House of Representatives concurred in the said amendments of the Senate to said bill; and on the same day, but not until after this concurrence had taken place, the Governor officially communicated to the House of Representatives information of

the fact that the said forty-two Representatives had, on the said 13th day of May, 1869, so resigned.

(Signed) "CONRAD BAKER, Governor.
"EXECUTIVE CHAMBER, Indianapolis, May 22d, 1869."

After the signatures of the presiding officers of the legislature upon the enrolled act is the following endorsement:

"This bill was presented to me on the 15th day of May, 1869, and the final adjournment of the General Assembly took place on the 17th day of the same month; and the bill not having been acted upon within five days thereafter, took effect, without executive approval, on the 22d day of May, 1869. (Signed) CONRAD BAKER."

FRAZER, J.—The following questions only, are necessary to be considered in order to reach a decision of this cause, viz: 1. Must the courts of this State take judicial knowedge of what is and what is not the public statutory law of the State? 2. When a statute is authenticated by the signatures of the presiding officers of the two houses, will the courts search further, to ascertain whether such facts existed as gave constitutional warrant to those officers to thus authenticate the act as having received legislative sanction in such manner as to give it the force of law?

1. There are some cases in our reports in which it has been conceded that an issue may be made upon the record by pleading, upon the determination of which, upon evidence adduced, the courts are to be governed in deciding what is a statute of the State; but a very full consideration of the question on the present occasion, aided by able counsel, has resulted in the clearest conviction that the doctrine has no support whatever in sound principle. Can it be tolerated that a court must be informed what the law is by the verdict of a jury, as would be in criminal cases? that in one case it shall be compelled, by the finding of an issue, to determine that the legislature has enacted thus and so, and in the very next case to be tried, where the same issue is not made by the pleadings, or the same evidence has not

been produced, or another jury has found differently, the very same court must determine that there is no such statute? It is a maxim old as the common law, and a rule of necessity, that the court takes judicial notice of public law; it is presumed to know what it is, and it is its duty to know it. Even the private citizen must know it at his peril; and his responsibilities and duties are based upon the conclusive presumption that he has this knowledge. Must the court employ the machinery of a trial to give information to the judge, which, as a citizen, he must, at the risk, possibly, of his liberty or life, have possessed before he was called to the bench?  It is a most mischievous departure from plain and wise maxims derived from that system of laws which forms the basis of, and constitutes largely the body of, ours; and, while it would have disturbed the harmony and order of judicial administration in England, it would in this State, in view of the provisions of our constitution, which contains specific directions for the mode of authenticating statutes by high legislative officers, acting under solemn oath, and requires a journal of legislative proceedings to be kept and published, be entirely destitute of any conceivable utility. The enrolled acts, with their authentication, are deposited in a public office, and are there accessible to everybody. The journals are public documents, at least, if not records; and are also within reach of all. Whatever, affecting the question of a quorum, such as the resignation of members, may have been lodged with the Governor, may also be inspected. In short, every fact upon which, in any view, depends the question whether a document purporting to be a statute has, by legislative action, been invested with the force of law, is, in its nature, a public fact which may be easily ascertained; it is a fact of public current history, and there is therefore no necessity for bringing it to judicial knowledge by the finding of an issue. It may be true that, ordinarily, the courts would not, unless the matter was questioned, make any investigations beyond the statute-book itself; but this argument is not forcible; for the

industry and research of counsel can as well put the court upon inquiry by an argument and a reference to the sources of information, as by pleading upon the record. To us it seems an astonishing fact in the history of jurisprudence, that there should, in this country especially, have ever existed a conflict of decisions upon the subject, or that it should have been seriously presented as a question for judicial determination.

In *Skinner* v. *Deming*, 2 Ind. 558, this question was virtually decided the other way, on the authority of *Purdy* v. *The People*, 4 Hill (N. Y.), 384. In *Coleman* v. *Dobbins*, 8 Ind. 156, there is a dictum to the same effect, though it is expressly declared that the point is not decided definitely. The judgment, however, implies such a decision, and cannot be supported otherwise than by this implication. These cases, and some others in our reports which concede the same point, have embarrassed us; but we cannot concur in them.

It is believed that this anomalous and essentially mischievous doctrine had its origin in New York. After the subject had there become enveloped in uncertainty by a multitude of curious opinions delivered in *Purdy* v. *The People*, *supra*—a case from the report of which it is almost impossible to tell what was held by the majority to be law upon any subject, but in which the actual judgment of reversal in favor of the plaintiff in error (who disputed the validity of the passage of an act, and yet did not raise the question by pleading) precludes the possibility of such a ruling—the Court of Appeals finally, in *The People* v. *The Supervisors, &c.*, 4 Seld. 317, without giving any reason or citing any authority to sustain it, did distinctly lay down the doctrine, in a case where it was entirely unnecessary to have considered the question at all. The opinion in *Coleman* v. *Dobbins* cites *Speer* v. *Plank Road Co.* 22 Penn. St. (10 Harris) 376. That case is not to the effect supposed. *Miller* v. *The State*, 3 Ohio St. 475, decides nothing whatever upon the subject. It is probable, however, that this

New York doctrine (now exploded in that State) has passed into other States, and been adopted without much examination. Indeed, whenever it is admitted that there is no certain and conclusive method by which the legislature is to make known its action, and the question, what is the statute law? is held to require search in all quarters for facts to answer it, it becomes quite plausible to say that these facts should be ascertained by an issue. When we come to consider the second question which we have proposed to ourselves, it will be seen that our view of it does not, however, involve us in that entanglement.

2. Immemorial usage, having the force of law, and therefore incumbent as a duty upon the presiding officer of a legislative body, requires that he should not proceed with business in the absence of a quorum. In case of doubt, he may count the members present, and thus ascertain the fact. A call of the house may be had in order to determine it. The very fact that the body proceeds with legislative business must therefore be, to all the world, very strong evidence of the presence of a quorum; for, if a quorum were not present, then a duty imposed by parliamentary law upon the presiding officer has not been performed; and it is not becoming that one co-ordinate department of the government should thus condemn another. But this is not all. Of necessity, the body must, in the first instance, judge for itself as to the presence of a quorum. No other tribunal can so well ascertain the fact as itself; and it would seem scarcely fit, therefore, that the courts should be at liberty to enter into that investigation. It may be possible that the question of the presence of a quorum is a legislative and not a judicial question, and that the courts, in a case like this, cannot inquire into it without passing beyond their jurisdiction as limited by the constitution, and thereby invading the field which belongs exclusively to the legislature. The form of our State government was intended to make these two departments co-equal but separate and independent of each other, each having distinct functions to perform,

and wholly beyond the control of the other. But these remarks are not intended as a decision of the point suggested, nor as an intimation of what would be its determination in a case where a solution of it might be necessary. The doubt is expressed as to our power to enter upon the question, because it should, unless the matter is otherwise clear, have some little weight in the consideration of the inquiry whether we can look behind the official authentication made by the proper officers of the two houses. Courts should be very careful not to invade the authority of the legislature. Nor should anxiety to maintain the constitution, laudable as that must ever be esteemed, lessen their caution in that particular; for if they overstep the authority which belongs to them, and assume that which pertains to the legislature, they violate the very constitution which they thereby seek to preserve and maintain. No person charged with official duties under the judicial department shall exercise any of the functions of the legislative department. Art. 3, sec. 1.

The question in hand may now be approached more closely, and, indeed, its importance only, and not at all any difficulties attending it, will justify the foregoing preliminary observations.

The constitution provides that a majority of all the members elected to each house shall be necessary to pass every bill, and that all bills "so passed shall be signed by the presiding officers of the respective houses." Art. 4. sec. 25. The vote on the passage of a bill cannot, of course, be lawfully taken in the absence of a quorum. What, then, was the purpose in requiring this attestation by the presiding officers? Was it intended as an idle form? It is not fair so to assume. What possible object, then, was sought to be accomplished by it, unless it was to furnish evidence that the paper thus attested had been by the proper processes of each house clothed with the force of law—evidence upon the enrolled act itself which should be taken as authentication and prove itself upon inspection? The act, the validity of which is here controverted, is thus attested by

sworn public officers, in the form required by the constitution. It is important, certainly, that the question, whether the enactment of a statute is valid, shall be made capable of ready and correct solution, and that the evidence thereof shall be preserved, and that it shall not depend upon doubtful or conflicting evidence. When all are bound to know the law, they should have the means of knowledge, and not merely reasons for conjecture, uncertainty, and doubt. It has been conceded in the argument for the appellant that the attestation in this case is probably *prima facie* sufficient to show a statute regularly and properly enacted, but contended that this only is the force of the authentication required by the constitution. The houses must keep journals of their proceedings, which, however, are not, like the enrollment, required to be either attested or preserved (1 G. & H. 563); and it is argued that there is an appeal to these, from the official attestation of the presiding officers, and to the archives in the executive department. Would the journals be as satisfactory to the mind? Such journals, it is notorious, are, and must be, made in haste, in the confusion of business, and are often inaccurate. Their reading is frequently omitted from day to day, so that those errors go without correction. They do not show the nature of the bill as introduced, but merely the amendments which have been proposed to it. They are not required to contain anything by which it could be even identified and its passage traced. They are not required to show whether or not a quorum is present. Journals such as these had been kept by the legislature of this State from the beginning. The convention which framed the present constitution must be supposed to have had knowledge of these things. Can the opinion be entertained that they meant that the journals, necessarily imperfect and incomplete memorials, should, as evidence, override the solemn attestation of the passage of a bill, which they were so careful to require, by the presiding officers? Or can it be supposed that they meant that two records should be looked to as

concurrent proofs of the same fact, and yet made no provision for guidance when these should happen to be in conflict? By what reason or analogy can we sustain ourselves in holding that the journal should override the signatures upon the enrolled act? Surely not because it is, in the nature of things, more likely to speak the whole truth upon the question in hand. Surely not because it is a rule that the truth of any other record in the world, attested as the law requires to make it proof, may be successfully combatted by something else, not made by law superior to the attestation of the proper officer.

This exact question has received the consideration of other American courts, who have thoughtfully and with careful steps reached the conclusion, that the authentication of the presiding officers of the legislature is conclusive evidence of the proper enactment of a law, and that they cannot look elsewhere to falsify it. *State ex. rel. &c.* v. *Young,* 5 Am. Law Reg. (N. S.), 679; *Pacific R. R. Co.* v. *The Governor,* 23 Mo. 353; *Duncombe* v. *Prindle,* 12 Iowa, 1; *Eld* v. *Gorham,* 20 Conn. 8; *Fouke* v. *Fleming,* 13 Md. 392; *People* v. *Supervisors of Chenango,* 4 Seld. 317; *People* v. *Devlin,* 33 N. Y. 269.

Some other New York cases have been cited in the argument, as in conflict with the view which we have already expressed. We do not so deem them, but if they were so intended, the recent one of *The People* v. *Devlin, supra,* shows that that doctrine is no longer maintained in that State.

It is believed that the English cases are, without exception, to the same effect—that the roll, called here the enrolled act, imports absolute verity, and therefore cannot be questioned. It is argued, however, that the English cases are not applicable here, for the reason that parliament did not keep, nor was it required to keep a journal of legislative proceedings. This argument is plausible, but it is, nevertheless, unsound. It assumes that the journal is in its nature equal or superior, as an instrument of evidence, to the

authenticated enrollment. But we have seen that in its nature it is not so, and that it is not admissible to infer therefrom that it was intended as sufficient to overthrow the latter. If we are correct in this, then the English cases upon the subject are entitled to great consideration.

But it is argued, that if the authenticated roll is conclusive upon the courts, then less than a quorum of each house may, by the aid of corrupt presiding officers, impose laws upon the State in defiance of the inhibition of the constitution. It must be admitted that the consequence stated would be possible. Public authority and political power must, of necessity, be confided to officers, who, being human, may violate the trusts reposed in them. This perhaps cannot be avoided absolutely. But it applies also to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments and correct or prevent abuses of their authority. It cannot authenticate a statute; that power does not belong to it; nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. It cannot, we think, look beyond that authentication, because of the constitution itself. If it may, then for the same reason it may go beyond the journal, when that is impeached; and so the validity of legislation may be made to depend upon the memory of witnesses, and no man can, in fact, know the law, which he is bound to obey. Such consequences would be a large price to pay for immunity from the possible abuse of authority by the high officers who are, as we think, charged with the duty of certifying to the public the fact that a statute has been enacted by competent houses. Human governments must repose confidence in officers. It may be abused, and there may be no remedy.

Nor is there any great force in the argument which seems

to be regarded as of weight by some American courts, that some important provisions of the constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argument overlooks the fact that legislators are sworn to support the constitution, or else it assumes that they will willfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligations.

It is finally suggested, in argument, that the endorsement upon the roll by the Governor and the statement by him attached thereto constitute a veto of the bill. This idea is wholly inadmissible, and, indeed, is expressly contradicted by those instruments. Certain facts are stated, but they are not made the basis of objection to the bill becoming a law. Both instruments must be looked to, to ascertain the intention of the executive.

Having reached the conclusion that the courts must, for themselves, ascertain what is the public law of the State, it follows that there was much unnecessary pleading in the case, and that the questions made by the demurrers were wholly immaterial, except simply the question, was the complaint sufficient? and, having determined that the courts cannot look beyond the enrolled act and its authentication, it results that the complaint was good in law, and that there is no available error in the record.

The case being thus disposed of without reaching the question—much and ably discussed in the argument—what constitutes a quorum under our State constitution? there is no necessity, nor indeed propriety, in any consideration of that subject by this court upon the present occasion.

The judgment is affirmed, with costs.

*J. W. Gordon, W. Morrow,* and *N. Trusler,* for appellant.

*T. M. Browne, S. E. Perkins, J. S. Harvey, N. Van Horn, J. E. McDonald, A. L. Roache,* and *E. M. McDonald,* for appellee.