STATE OF INDIANA EX REL. MTA, ETC. *v.*
INDIANA REVENUE BOARD ET AL.

[No. 767A39. Filed February 6, 1969. On Petition for Transfer. For Appellate Court Opinion See 242 N.E. 2d 642.]

*John Neff, Richard M. Givan, Lieber and Neff, Bowen, Myers, Northam and Givan,* of Indianapolis, for respondent.

*John J. Dillon,* Attorney General, *Charles S. White,* Chief Counsel, *Virginia D. McCarty,* Deputy Attorney General, for petitioners.

PER CURIAM.—This action is before this court on petition to transfer from the Appellate Court. Hunter and Arterburn, JJ., believe that transfer should be denied. DeBruler, C.J., and Jackson, J., are of the opinion that the transfer should be granted. Givan, J., did not participate in this case.

There not being a majority of those judges participating in this case in favor of granting the petition to transfer, it is denied.

Transfer denied.

Givan, J., Not Participating.

HUNTER, J.—The respondent filed a petition for a writ of mandate in the trial court to require the petitioners to comply

with House Enrolled Act No. 1818 of the 1967 General As-Assembly. The cause was transferred to the Indiana Appellate Court, *State ex rel. Mass Transportation Authority* v. *Indiana Revenue Board* (1968), 144 Ind. App., 242 N. E. 2d 642, which entered a judgment for the respondent. The only dispute is as to whether said bill became a law, and, if it did, the judgment of the Appellate Court was correct, and the petition for transfer should be denied.

The bill was duly passed and signed by the proper officials of both Houses of the 95th General Assembly. It was presented to the Governor on the same day that the General Assembly adjourned its 1967 session. The Governor never acted on nor returned the bill to the Secretary of State, and it has never been published nor distributed to the clerks of Circuit Courts by the Secretary of State. Respondent contends that the bill became law, by the Governor's inaction, five days after the legislature was adjourned. Petitioners contend that the bill did not become law and that the Governor of Indiana has the authority to exercise what is commonly known as a "pocket veto." Both parties agree that the dispute is to be decided by a proper interpretation of Article 5, section 14 of the Constitution of Indiana:

"§ 14. Bills signed or vetoed.—Every bill which shall have passed the General Assembly, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it, with his objections, to the House in which it shall have originated; which House shall enter the objections, at large, upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that House shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other House, by which it shall likewise be reconsidered; and, if approved by a majority of all the members elected to that House, it shall be a law. If any bill shall not be returned by the Governor within three days, Sundays excepted, after it shall have been presented to him, it shall be a law, without his signature, unless the general adjournment shall prevent its return; in which case it shall be a law, unless the Governor, within five days next after such adjournment,

shall file such bill, with his objections thereto, in the office of Secretary of State; who shall lay the same before the General Assembly at its next session, in like manner as if it had been returned by the Governor. But no bill shall be presented to the Governor, within two days next previous to the final adjournment of the General Assembly."

There are three provisions in the section which are most relevant to a determination of this question and which appear to be in conflict: (1) The requirement that every bill passed by the General Assembly be presented to the Governor, (2) The provision that no bill can be presented to the Governor in the last two days of the legislative session (with no corresponding restriction on the General Assembly not to enact new legislation during this period), and (3) The provision that, if a general adjournment prevents a bill's return by the Governor, it becomes a law unless the bill and his objections thereto are filed in the office of Secretary of State within five days after the adjournment.

The present conflict is this: how are these three provisions to be applied to bills that are duly passed and authenticated by both Houses during the last two days of a legislative session. If the General Assembly elects to follow the first of these three provisions which directs that all bills, whenever enacted, shall be presented to the Governor, are they not thereby acting inconsistently with the second provision which states that no bills shall be presented to the Governor in the last two days of the legislative session? To make matters worse, suppose the legislature chooses to follow the first mandate, ignore the second, and present the bills to the Governor on the last day of the legislative session. The question then becomes: was there an effective presentment, and, if so, does the bill become law according to the third provision if the Governor fails to act on the bill within the next five days? This is the question facing this Court, and the only conclusion which is apparent from restricting one's view to the literal provisions of the section is that there is an apparent conflict in the language.

In interpreting this section, it becomes necessary for this Court to look to the history of its adoption particularly with a view toward discerning the intentions of the drafters of our present Constitution. This Court in another dispute involving this same section once declared:

"If the meaning of a constitutional provision is doubtful, courts may examine the proceedings of the convention that framed the provision, to aid in its interpretation." *Woessner* v. *Bullock* (1911), 176 Ind. 166, 169, 93 N. E. 1057, 1059.

It seems remarkable that in view of this well-accepted general rule regarding the construction of constitutional provisions that this court has never previously cited nor referred to the proceedings of the constitutional convention in any case involving the particular provisions here in dispute. For this reason we propose to review the proceedings of the Constitutional Convention of 1850 as regards the adoption of Article 5, section 14.

## THE 1850 CONVENTION

The Constitutional Convention of 1850 appointed several committees to do most of its original drafting. Two of the most prestigious of these were the Committee on the Legislative Department and the Committee on the Executive. On October 31, 1850, the Committee on the Legislative Department submitted a proposal designated section 19, which gave the Governor a veto power and provided that a two-thirds majority of the members of each house present was required to override this veto. The last sentence of section 19 read as follows:

"If any bill shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, it shall be a law in like manner as if he had signed it, unless the General Assembly, by adjournment, prevent such return, in which case it shall be a law, unless sent back within three days after their next meeting." *Journal of the Convention of the People of Indiana* (Indiana

Historical Collections Reprint, 1936) [hereinafter referred to as *Journal*] 169.

According to this provision, the Governor was given five days in which to act on a bill or it would become law, and, if, by adjournment of the General Assembly, the Governor was prevented from returning it to the legislature for their reconsideration, he was required to do so within three days of their next session. In any event, the Governor's failure to act would result in the bill's becoming a law. There was no authority granted to the Governor to pocket veto a bill after the General Assembly had adjourned.

A minority report was submitted by certain members of the Committee; the only difference between their proposal and section 19 was that the minority felt that only a simple majority of all the members of each house should be required to override the Governor's veto. *Journal, supra,* at 170-71. The last sentence of the minority report was identical to the last sentence in the majority report.

On that same day, the same Committee submitted section 20 to the Convention. This provision provided the Governor a veto power over joint resolutions "according to the rules and limitations prescribed in case of bills." *Journal, supra,* at 171.

On the following day, the Committee on the Executive submitted a proposal to the Convention which was designated as section 22. Section 22 was similar to the legislative committee's section 19 and gave the Governor the power to veto a bill. There were two primary differences between the proposals recommended by these two committees:

(1) Section 22, similar to the minority report on section 19, only required a majority of all the members of each house to override a veto, and,

(2) The last sentence of section 22 read as follows:

"If any bill shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law, unless the general

adjournment prevents its return; in which case it shall be a law." *Journal, supra,* at 180.

According to this provision, the Governor was required to act on a bill in time to return it to the current session of the General Assembly or it became a law notwithstanding his objections. If the General Assembly adjourned before the Governor had an opportunity to return the bill, he simply lost his power to veto it, and the bill became a law without his signature.

On this same day, the Committee on the Executive submitted section 23 which was identical to section 20 submitted by the legislative committee and gave the Governor the power to veto joint resolutions. *Journal, supra,* at 180.

On December 13, the legislative committee's sections 19 and 20 were given a second reading. At that time, one of the delegates realizing the duplication that had occurred in the reports of these two committees made the following motion regarding section 19.

"This section, sir, properly belongs to another article. It belongs to the article reported by the committee on the executive department. This subject was referred to that committee by the Convention, and the committee have reported a section, which will come up for consideration at the proper time. I therefore move that this section be laid upon the table." 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* (Indiana Historical Collections Reprint, 1935) [hereinafter referred to as Debates] 1127.

Both sections 19 and 20 were tabled by the Convention apparently in deference to the corresponding proposals (sections 22 and 23) that had been submitted by the Committee on the Executive. *Journal, supra,* at 432.

On December 26, section 22 came before the Convention for the second of its three readings. Two proposed amendments to the section were defeated. Then one Mr. Rariden, a delegate from Wayne County, moved to amend the section in a way

which would seem to indicate that he had been given an incorrect copy of the committee's proposal. He moved to strike out the word "not" in the last line "so that if the governor were prevented, by the adjournment of the General Assembly, from sanctioning a bill which was sent to him for his signature, it should nevertheless be a law." 2 *Debates, supra,* at 1322. The motion was an anomaly in that the last line of the section, as originally introduced, contained no negative and provided precisely what Mr. Rariden wanted. On the following day, this delegate withdrew his amendment and moved for an amendment which he felt would clarify this last sentence. The last sentence, as he wished to amend it, would have read:

"If any bill shall not be returned by the Governor within time before the general adjournment for each house of the Legislature to act upon the same, it shall be a law notwithstanding." *Journal, supra,* at 548.

In support of his amendment, Mr. Rariden made the following remarks:

"I desire to have this Convention understand what they are doing. I aver that this section, as it stands, enlarges the veto power four-fold. Let me direct the attention of gentlemen for a moment to what will be the condition of the Legislature hereafter. A section has been reported to us which provides that there shall be but one session in every two years, and we have adopted a section which provides that no law shall pass unless it have the sanction of a majority of all the members elected.

. . .

It is proper enough that the Governor should have the power to call upon the Legislature to re-consider a measure that they had passed. It would be but a salutary check upon hasty legislation to require them to reflect upon what they had done. But the provision contained in this section puts it in the power of the Governor to thwart and check the action of the legislative body altogether . . . It is giving to the Executive the power, practically to defeat the action of the Legislature, and to avoid responsibility. He may keep a bill in his pocket, and he may say 'Oh I have been debating and reflecting upon it, and I cannot make up my mind,'

and make out of his very delay an appearance of great regard for the public interest.

. . .

*It is argued in favor of the section that it is intended to prevent the fraudulent action of members in holding back their measures until too late for the Executive to examine them and return them previous to the adjournment.* Sir, if we suppose that the representatives hereafter are to be knaves, and the executive's business is to watch and restrain them; they should be dispensed with, and their functions vested in the Executive; they can be of no other use than to make trouble. Measures so withheld, and from such men, are unworthy of the sanction of the Executive as we may suppose, and must intend some wrong to the public. The hurry and confusion which prevails at the close of the legislature has been heretofore a subject of complaint, and an excuse for Governors exercising the pocket veto; but it grew out of local legislation, a great mass of which was thrown upon the last days of the session.

. . .

Sir, I am opposed to it . . . It will be in the power of the Executive at any time to defeat legislative action by merely keeping a bill in his pocket for more than five days." 2 *Debates, supra,* at 1323 (our emphasis).

Following Mr. Rariden's remarks, several delegates debated the propriety of allowing the executive any veto power at all. Mr. Rariden then attempted to redirect the attention of the convention on his amendment.

"If no one else desires to speak upon the subject, I wish to reply briefly to the remarks of the gentleman from Posey, and the gentleman from Tippecanoe.

It does strike me that these gentlemen have avoided debating the question that is immediately before us. It is not the veto power, in the ordinary acceptation of the term, that I object to. What I oppose is the pocket veto. I do not wish to deprive the Executive of the right to assign his reasons for being opposed to the passage of a bill, or to prevent him from calling on the legislative body to exercise a sober second thought. I am not opposed to that.

. . .

I do not propose to prevent the Governor from reaching his veto and saying it shall not be a law until the Legislature

goes over it again, rethinks upon it, and again acts. But it is the pocket veto that I am at war with.
. . .

The effect of my amendment, is to let the responsibility stare the Executive in the face. When a measure has been matured, and passed through all the forms of legislation, and sent to him for approval, let him understand that the measures, however fatal to the interests of the country, shall be a law, unless he acts upon it. His nonaction shall confirm the action of the members. Let him act and approve, or assign his reasons against it, it shall be a law.
. . .

My proposition is, that if the Governor does not return the bill, with his objections to it, in time for the two Houses of the General Assembly to act upon it, it shall be a law notwithstanding the veto.
. . .

My amendment does not strike out or limit the veto power proper. It is to abolish the improper and cowardly exercise of it." 2 *Debates, supra,* at 1329-30.

While Rariden's motion was pending, another delegate moved to require a three-fifths majority to override a veto. Both of these proposed amendments were tabled by the Convention in the same vote. After two other amendments to the section were defeated, Mr. Rariden, apparently as determined and misinformed as ever, again moved to amend the section by striking the word "not" from the last line, and this motion was defeated (possibly because it was such an anomaly). The proposal was then engrossed by the convention for a third reading. Section 23, dealing with the veto power over joint resolutions, was also engrossed for a third reading without amendment. *Journal, supra,* at 548-50.

On this same day, a delegate submitted the following proposal which was designated section 29:

"No new bill shall be introduced into either House of the General Assembly within three days before the day of a general adjournment, and no bill shall be presented to the Governor for his approval on the day of a general ad-

journment, or on the next preceding day." *Journal, supra,* at 551.

The debate that followed the introduction of this new idea is particularly relevant to the case at bar:

"I fear, sir, that some difficulty may grow out of such a provision. We have adopted a provision to be inserted in the Constitution, and a very proper one it is, that the titles of all laws shall indicate the substance of such laws. This prohibition upon the introduction of bills will prevent the possibility of either House taking up anything that may have been forgotten or overlooked, and acting upon it at a late period of the session. I never yet seen a legislative body that did not, in the last days of the session, collect up a great many things which had been overlooked, not through any design to keep them back, but in consequence of members being otherwise occupied during the whole session.
. . .

Mr. Kelso moved to amend the amendment so as to provide that the Legislature may, by a majority of two-thirds, pass any law within the last three days of the session. Mr. Edmonston. It seems to me, sir, that such a provision will not accomplish the object which the gentleman from Switzerland has in view. The amendment he proposes is, that the General Assembly may pass any law by a majority of two-thirds, on the last days of the session. This does not remedy the evil.

Mr. Kelso. I will change the amendment so as to make it read 'introduce and pass.' Mr. Dunn of Jefferson. I am afraid we are carrying our restrictions upon the action of the Legislature too far. It may be proper to prescribe some such rule as that proposed by the gentleman from Lake.

'That the General Assembly should refrain from introducing any new matter within the last few days of the session; but they should have power to act upon that which may have been previously introduced. It might become necessary to remedy some defect in a bill that had been passed in a previous part of the session. It seems to me that we can as well trust this whole matter to the wisdom of the Legislature without any Constitutional provision. I therefore, move to lay the whole subject on the table.

The motion was agreed to, and the section and amendments were laid upon the table." 2 *Debates, supra,* at 1332.

At least as regards its first introduction, a proposal limiting the ability of the legislature to act in the last few days immediately proceeding its general adjournment did not find favor with the Convention.

On the following day, section 22 was given its third and final reading. One delegate moved to recommit the entire section to the Committee on the Executive with instructions to limit the Governor's time to act on each bill to three days and to limit his veto power to permit only objections involving the constitutionality of the legislation. In support of his motion the delegate declared:

> "I think then, sir, that this section is fraught with mischief. I understand that by it the Governor *may,* if he chooses so to do, pocket every bill passed within five days before the termination of the session. This is too great a power to be given to any one man. I am willing to see him have a *qualified* veto, and would be disposed to confer on him the right to return a bill, with his objections, provided they were confined to the constitutionality of the proposed measure, but I have great and insuperable objections to his interposing his veto upon any measure, merely upon grounds of expediency *alone.* I cannot but think that when any proposition has received the sanction of the immediate representatives of the people, who, coming fresh from among them, are presumed to be charged with their instructions and wishes, and enjoying their confidence, that it ought not to be outweighed or nullified by the arbitrary fiat of a single individual; and more especially when it is remembered that no law *can* be hereafter passed but by the vote of a majority of the members elect to the Legislature, and *that* confined to general subjects of legislation and gravely and formally expressed by ayes and noes, entered at length upon the journal. I believe that the exercise of the veto power, if thus guarded, might be productive of no mischievous results; but, on the contrary, might have a good effect. If we restrict the right of the Executive to withhold a bill or resolution to *three* days instead of *five,* as provided in the section under consideration it would not be so very objectionable; still it would be leaving in his hands an extraordinary power, which would be liable to great abuse.

In the Constitution of Kentucky it is provided that bills remaining in the hands of the Executive ten days, unless returned within three days of the succeeding session, shall become laws. We cannot have that advantage here, because of biennial sessions; and if the Governor pockets bills within five days preceding the end of one session, they remain there for two years. This, sir, I can never consent to, and I earnestly call upon the members of this Convention to remedy this evil before it is too late." (original emphasis) 2 *Debates, supra,* at 1346.

Although the motion to recommit the proposal to the committee failed to pass, the delegate's remarks apparently had a telling effect on the convention, for when section 22 itself was voted upon by the Convention, it failed to pass by a vote of fifty-five to fifty-five. *Journal, supra,* at 556-59.

At this point in the Convention, there was no proposal, pending or passed, which provided the Governor with any veto power over a bill, much less a pocket veto. The proposal which had been submitted by the Committee on the Legislative Department had been tabled in deference to section 22, and section 22 had been defeated.

At least according to the amount of debate, the major issue which had caused section 22 to be defeated seemed to be the failure of the Convention to find a compromise between two competing interests. On the one hand, a great number of delegates did not want to allow the Governor to be able to veto a bill without his having to resubmit it to the legislature. On the other hand, many delegates were apprehensive about providing that the veto power would be forfeited if not exercised before the adjournment of the General Assembly because they envisioned that the Governor might be presented several bills during the last few days of the session and would not have ample time to give them full consideration. The proposal which would have limited the General Assembly's ability to act in the last three days of the session had not proved to be an acceptable compromise to the Convention because the delegates did not believe that every session would be able to solve all its

problems three days prior to its general adjournment. The Convention had restricted itself to a 'yes' or 'no' proposition, i.e., should the adjournment of the current session cut off the Governor's power to veto or should he be allowed to pocket veto a bill which he could not return because of said adjournment? Neither proposition was acceptable to the Convention.

In the afternoon session of that same day, section 23, requiring joint resolutions to be presented to the Governor, came up for its third and final reading. One delegate moved that the section be tabled because of the failure of section 22, but, on request from another delegate, agreed to withdraw his motion momentarily. 2 *Debates, supra,* at 1348. Another delegate then moved to recommit the entire section to the committee with instructions to amend the proposal by inserting Art. 4, § 22 of the 1816 Constitution. As amended, the proposal would read as follows:

"Every resolution to which the concurrence of both Houses may be necessary, shall be presented to the Governor, and before it shall take effect, be approved by him; or, being disapproved, shall be repassed by a majority of all the members elected to both Houses. And every bill which shall have passed both Houses of the General Assembly, shall be presented to the Governor: If he approve, he shall sign it; but if not he shall return it, with his objections, to the House in which it shall have originated, who shall enter the objections at large upon their journals, and proceed to reconsider it. If, after such reconsideration, a majority of all the members elected to that House shall agree to pass the bill, it shall be sent, with the objections, to the other House, by which it shall likewise be reconsidered, and, if approved by a majority of all the members elected to that House, it shall be a law; but, in such cases, the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill, shall be entered on the journals of each House respectively. If any bill shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, it shall be a law, in like manner as if he had signed it, unless the general adjournment prevents its return; in which case it shall be a law unless sent back within three days after their next meeting." *Journal, supra,* at 559-60.

This motion was carried by the Convention so the proposal was to be returned to the committee pursuant to these instructions. Several other proposed amendments were defeated by the Convention, including:

(1) A proposal giving the Governor thirty days after adjournment to return a vetoed bill to the Secretary of State,

(2) A proposal requiring a three-fifths majority to override a veto,

(3) A proposal making the bill a law if not vetoed before the expiration of the current session, and

(4) A proposal providing that a new bill could not be introduced in either House within three days of the final adjournment.

These proposals had been debated prior to section 22's defeat, and the delegates were not willing to reinstate old problems. Thus, section 23 was returned to the Committee on the Executive with instructions to insert a provision giving the Governor a veto power in accordance with the 1816 Constitution. This proposal required the Governor to exercise his veto power within five days unless the general adjournment prevented the return of the bill "in which case it shall be a law unless sent back within three days after their next meeting."

On January 6, Delegate Morrison of the Committee on the Executive reported section 23 to the Convention; it had been amended according to the instructions given to the committee by the Convention. But, as soon as Mr. Morrison had finished the committee report, he moved to amend the section:

"Mr. Morrison. Mr. President, it will be discovered by gentlemen, that the section just read is essentially, literally, and positively, the section contained in the old Constitution. And, inasmuch as that section, in my opinion, is not calculated to answer the purpose, as it ought to do, under the new regulations which we shall have to make, in reference to biennial sessions, I shall offer an amendment to it. I do not ask the concurrence of the Convention in that report,

for the reason that I now move to concur in the adoption of the section, with an amendment, which amendment is, to strike out the section and insert the following, as a substitute in full.

The President. The Chair would remark to the gentleman from Marion, that there is no question of concurrence. The committee have amended the section under positive instructions from the Convention, and through their Chairman have reported the same back. The question will be upon its passage.

Mr. Morrison. Then, sir, I move that the section be recommitted, with the following instructions: 'provided that bills vetoed by the Governor, may be passed by a majority of all the members elected to the two Houses, to be determined by yeas and nays. Bills to become laws unless returned within three days, unless a general adjournment prevents a return, in which case it shall be a law, unless the Governor, within five days after such adjournment, shall file the same, with his objections thereto, in the office of the Secretary of State, who shall lay the same before the General Assembly at its next session, for action, in the same manner as if it had been reported by the Governor.'

I will call the attention of the Convention to the alteration which I make. We provide, in the new section, that the Governor shall have but three days instead of five, at the close of the session, to consider bills presented to him. And there shall be no new bills presented to him, during the two last days of the sessions, so that he will not be permitted to pocket a bill, but must decide upon it, one way or the other. If he have not time to examine a bill and return it to the Legislature, previous to the close of the session, he can file it in the office of the Secretary of State, to be presented to the next Legislature, whether the session be a called or a regular one. By this means, there can be no skulking. So far as the veto power is concerned, under the operation of this provision, it will be nothing more than a mere revisory power—nothing but what can be controlled by a majority of the Legislature. Again, in regard to joint resolutions, the proposition contains simply a provision that all joint resolutions which require the signature of the Governor, shall go through the same formula as bills. That is sufficient to indicate to the Legislature, at all times, the course to be pursued in regard to resolutions of this character. I hope the Convention will re-commit, in order to make the change which I have suggested." 2 *Debates, supra,* at 1447-48.

It is interesting to note that, in the actual instructions proposed by Mr. Morrison, as recorded in the *Journal* or the *Debates*, there is no mention of a two day limitation on the presentment of bills to the Governor by the General Assembly. It is in Morrison's remarks to his proposed instructions that any mention of this two-day limitation first appears. Its purpose, according to Morrison, was "so that (The Governor) will not be permitted to pocket a bill, but must decide upon it one way or the other." One delegate observed:

> "that he had no particular objection to the proposition, except to that part of it which provided that no bill should be sent to the Governor during the last two days of the session. He did not see what use there was in having the legislature in session if it were not at liberty to send bills to the Governor for his approval, until the end of the session." 2 *Debates, supra,* at 1448.

There was no further discussion or debate on this particular provision, and, after two amendments to Morrison's proposal were defeated, the Convention voted to recommit the section to the committee so that the new proposal could be adopted.

On January 23, Mr. Morrison reported section 23, as amended, to the Convention. The section then read as follows:

> "Section 23. Every bill which shall have passed both Houses of the General Assembly, shall be presented to the Governor. If he approve, he shall sign it; but if not, he shall return it with his objections to the House in which (sic) shall have originated, who shall enter his objections at large upon their journals, and proceed to reconsider it. If after such reconsideration a majority of all the members elected to that House shall agree to pass the bill, it shall be sent, with the objections, to the other House, by which it shall likewise be reconsidered, and, if approved by a majority of all the members elected to that House, it shall be a law; but in such cases, the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill, shall be entered upon the journals of each House respectively. If any bill shall not be returned by the Governor within three days (Sunday excepted) after it shall have been presented to him, it shall

be a law in like manner as if he had signed it, unless the general adjournment prevents its return; in which case it shall be a law unless the Governor, within five days after such adjournment, shall file the same, with his objections thereto, in the office of the Secretary of State, who shall lay the same before the General Assembly, at its next session, for its action, in the same manner as if it had been returned by the Governor. But no bill shall be presented to the Governor within two days previous to the adjournment of the General Assembly. Every joint resolution, requiring the signature of the Governor, shall be presented to him, and before it shall take effect, be approved by him; or being disapproved, shall be re-passed by a majority of all the members elected to both Houses, according to the rules and regulations prescribed in case of a bill." *Journal, supra,* at 750-51.

The convention, now apparently weary of debating this provision, suspended their rules requiring 'yeas' and 'nays' to be taken, passed the section without further discussion, and referred it to the Committee on Revision, Arrangement and Phraseology. 2 *Debates, supra,* at 1787. On February 6, this committee reported the provision back to the Convention as Art. 5, § 14 of the new Indiana Constitution. The section, as amended by the revision committee, was adopted by the Convention without discussion and became part of our 1851 Constitution.

From the vast proceedings and debates which occurred during the Convention, three conclusions may properly be gleaned as regards Art. 5, § 14.

(1) It was the expressed intention of the Convention not to allow the Governor a power to *permanently pocket veto* a bill even if an adjournment of the General Assembly prevented its return.

(2) The provision that prevented presentment of the bills to the Governor during the last two days preceding adjournment was introduced with the expressed intent of requiring the *Governor to act affirmatively* on each bill and was added to § 14 without debate or discussion.

(3) A provision preventing the General Assembly from enacting any new legislation during the last days of a

legislative session did not meet with the approval of the Convention and was defeated on at least two different occasions.

## COURT INTERPRETATIONS OF THESE PROVISIONS

The first case decided by this court involving the presentment of a bill within the last two days of a legislative session was *Bender* v. *The State* (1876), 53 Ind. 254. In *Bender,* the Governor, though presented the bill within the last two days, had apparently approved the bill and filed it with the Secretary of State. The court held that the law in question was valid, *the late presentment notwithstanding.*

In arriving at their decision in *Bender,* the court *could* have reasoned that, since all bills must be presented to the Governor, and since there is no express restraint on the General Assembly's actually enacting legislation during the last two days, the provision preventing a presentment to the Governor during the last two days was only a directive to the legislature and would not be grounds for declaring a bill invalid. Such reasoning *could* have been supported by the intent of the drafters of the provision as exemplified by the proceedings and debates at the Constitutional Convention. Such reasoning *could* have also found support in the practical construction of the provision apparently given by both the legislature and the Governor in treating the presentment as valid. A "practical construction" of the Constitution by the General Assembly "must and does have great weight with the court in deciding the constitutional question." *State ex rel. White* v. *Grant Superior Court* (1930), 202 Ind. 197, 208, 172 N. E. 897. The court was certainly aware that the effect of the decision was to make the validity of a law not dependent upon a strict adherence to the last sentence of Art. 5, § 14, at least where the Governor accepted and acted upon the late presentment.

The court chose, however, to justify its decision in *Bender* by using a different line of reasoning. Citing *Evans* v. *Browne*

(1869), 30 Ind. 514, it declared that the court was without power to look beyond the enrolled act to ascertain whether it had been passed in conformity to the constitution. In the *Evans* case, the defendant state auditor had contended that a particular bill had not become law and alleged that when the bill was passed by the House of Representatives, the House had failed to have a quorum of its members present and could not have voted on any bill according to a strict adherence to the Constitution. The court in *Evans* declined to look beyond "the enrolled act and its authentication" by the officers of each House to determine its constitutional validity. Using *Evans* as authority, the court in *Bender* concluded that it would not look behind the bill to see when the required presentment was made to the Governor.

Had the court in *Bender* stated, rather than implied, that a late presentment would not affect the validity of a law, the question would probably have been settled and the present conflict avoided. Regardless of the reasoning employed by the *Bender* decision, it was cited for the proposition that a presentment in the last two days of a legislative session would not render a bill invalid. See *Board of Comm.* v. *Buford* (1883), 93 Ind. 383; *Western Union Telegraph Company* v. *Taggart* (1894), 141 Ind. 281, 40 N. E. 1051.

In *State ex rel. Colbert* v. *Wheeler* (1909), 172 Ind. 578, 89 N. E. 1, this court held that a Governor did not have to file a bill with the Secretary of State for it to become a law. In that case the bill in question had been presented to the Governor on March 8, and the legislature had adjourned on March 11. When the Secretary of State certified the "Acts of 1895," he indicated that the enrolled bill was "missing," and the court judicially noted that the enrolled act was not on file in that office. Under the circumstances, the court was compelled to look beyond "the enrolled act and its authentication."

"It is evident that said enrolled house act No. 132 became a law, unless the Governor vetoed the same, as provided by

said article 5, § 14, of the Constitution, whether or not it was filed in the office of the Secretary of State." *State ex rel. Colbert* v. *Wheeler, supra,* at 588.

At this point the courts had held that a bill's being presented to the Governor in the last two days would not render the law invalid where the Governor signed and filed it with the Secretary of State and that the Governor's not taking any action and not filing a bill with the Secretary of State would not render a law invalid where a proper presentment had been made. How then could this last sentence of Art. 5, § 14 ever be invoked to lend support to a contention that the Governor of Indiana had a pocket veto where the drafters of the very provision relied upon had expressed an intention to allow the Governor no such power?

The only case attempting to answer this question is *State ex rel. Owen* v. *Fortieth Judicial Circuit* (1931), 202 Ind. 354, 174 N. E. 423, and this is the case most heavily relied upon by the petitioners in the case at bar. In that case, a bill was actually delivered to the Governor by the Secretary of the Senate on the same day that the 76th session of the General Assembly was adjourned. The bill was retained by the Governor and was never filed with the Secretary of State nor returned to the General Assembly. The court held that the bill had not become law.

The court attempted to distinguish *Bender* and the other cases which had held that a law was valid even though presented during the last two days of the session. It observed that in each of these cases:

"the bills there questioned were properly authenticated by the proper officer of each house, and had either been approved by the Governor or else he had deposited them with the Secretary of State, without his approval, . . . [and] in the case at bar, the facts do not come up to the above-stated rule in that the bill is not found in the depository designated by the supreme law." *State ex rel. Owen* v. *Fortieth Judicial Circuit, supra,* at 357.

The court apparently either overlooked or deliberately decided not to discuss *State ex rel. Colbert* v. *Wheeler* and other cases which had held that the validity of a law was not dependent on the filing of a bill with the Secretary of State. We can not consider this act to be a prerequisite to a bill's becoming a law; Art. 5, § 14 expressly provides that, when an adjournment prevents the Governor's returning a bill to the General Assembly, "it shall be a law *unless* the Governor within five days next after adjournment shall file such bill with his objections thereto, in the office of Secretary of State . . ."

After attempting to distinguish the previous cases, the court justified its holding in two sentences:

> "The bill here in question was presented, or attempted to be presented, to the Governor between 5 and 7 o'clock p.m. on the last day of the session. No official action was taken by him, neither was there any obligation imposed upon him to act, as the bill was not presented to him more than two days next previous to the final adjournment of the General Assembly." *State, ex rel.,* v. *Fortieth Judicial Circuit, supra,* at 358.

These two sentences, constituting the only positive reasoning for the court's decision, should be carefully scrutinized. We do not believe that anything can be proved by pointing out that no obligation was imposed on the Governor to act on the bill in question, for, regardless of when the bill is presented to a Governor, he has no constitutional obligation to act on it. It is for this very reason that Art. 5, § 14 provides that a Governor's inaction will result in a bill's becoming a law. We can find no justification for the holding in *State ex rel. Owen* v. *Fortieth Circuit Court,* and we find it in conflict with Art. 5, § 14, the intentions of the drafters of that provision, and the other decisions of this court. For this reason, we are of the opinion that the holding in that case should be overruled by this court.

We find no other cases directly related to the power of

the Governor to pocket veto a bill presented to him on the last two days of a legislative session.

## CONCLUSIONS

From the foregoing discussion, certain conclusions may properly be made as regards the power of the Governor to pocket veto a bill:

(1) No such power is expressly provided by the Indiana Constitution.

(2) Following well-established rules of interpretation, no such power should be implied unless to accomodate the unquestioned intentions of the framers of our present Constitution.

> "The veto power is a restriction upon the legislative branch of the government and is in derogation of the general plan of government for the separation of powers. This power, therefore, must be strictly construed." *Hendricks* v. *State N. W. Crime Comm.* (1963), 245 Ind. 43, 52, 196 N. E. 2d 66. ". . . (W)e are dealing with a legislative enactment under a constitution which provides:
>
>> 'The Legislative authority of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives. . . .' Art. 4, § 1, Indiana Constitution.
>
> Since the Indiana Constitution provision granting veto power of the Governor has been transferred from the Legislative branch of the government to the Executive branch of our government, it is merely a limitation on the power fundamentally vested in the Legislature. Such limitation should therefore be exercised only as it is expressed in clear and unambiguous terms within the constitutional provision, itself." (concurring opinion) *Hendricks* v. *State N. W. Crime Comm., supra,* at 59.

(3) From the proceedings and debates of the Constitutional Convention of 1850, it does not appear that the delegates wished to allow the Governor the power to pocket veto any legislation. In proposing the provision which ultimately be-

came Art. 5, § 14 of the Indiana Constitution, Delegate Morrison announced to the Convention:

"We provide, in the new section, that the Governor shall have but three days instead of five, at the close of the session, to consider bills presented to him. And there shall be no new bills presented to him, during the two last days of the sessions, *so that he will not be permitted to pocket a bill, but must decide upon it, one way or the other.* If he have not time to examine a bill and return it to the Legislature, previous to the close of the session, he can file it in the office of the Secretary of State, to be presented to the next Legislature, whether the session be a called or a regular one. *By this means, there can be no skulking. So far as the veto power is concerned, under the operation of this provision, it will be nothing more than a mere revisory power— nothing but what can be controlled by a majority of the Legislature."* (our emphasis) 2 *Debates, supra,* at 1447-48.

(4) There is no previous case law which presents a sound basis for holding that the Governor has a pocket veto. The decision relied upon by the petitioners, *State ex rel. Owen* v. *Fortieth Judicial Circuit, supra,* presents no persuasive justification for implying such a power in derogation of the expressed intentions of the framers of our constitution and should be overruled.

For all the foregoing reasons we believe the following interpretation must be given to Art. 5, § 14.

(1) There is no provision, express or implied, which prevents the General Assembly from enacting new legislation during the last two days of a legislative session.

(2) Legislation enacted during this two day period should be presented to the Governor in accordance with the first sentence of Art. 5, § 14.

(3) The last sentence of Art. 5, § 14 which declares that no bill "shall" be presented to the Governor during the last two days of a legislative session should be interpreted as a directive to the General Assembly and the Governor as regards legislation which *can* be presented prior to this time, but no

law should be deemed invalid because a presentment was made during these last two days.

(4) There is but one way for a Governor to exercise a veto power in Indiana. If the legislature is still in session the Governor must return the bill with his objections to the House in which the bill originated within three days after it is presented to him. If an adjournment prevents such a return, the Governor must file the bill with his objections with the Secretary of State within five days after said adjournment. If a Governor fails to take any action on a bill that has been duly passed, properly authenticated and presented to him for his approval, the bill will become a law regardless of when the presentment shall have occurred.

Applying these interpretations to the case at bar, we believe House Enrolled Act No. 1818 became a law five days after the adjournment of the 95th General Assembly. It follows that the result reached by the Appellate Court for the respondents was correct and that transfer should be denied.

Arterburn, J., concurs.

Givan, J., not participating.


JACKSON, J.—I wish to compliment Judge Hunter on the thorough and careful compendium of the facts and issues presented in his opinion and the research into the debates preceding the adoption of our present constitution, however I can not concur in his conclusions.

The Appellate Court majority opinion succinctly states a well known fact of political life on p. 5 thereof, wherein it states that ". . . the common practice has flourished of presenting important and vital bills to the Governor within the last two days of the session, contrary to the constitutional prohibition, and . . ." The same page of that opinion contains a compilation of pocket vetoes exercised in the years 1965 and 1967, we assume further research would show that in the years

following our admission into the Union as a State in 1816 many others were exercised in view of "the common practice" above referred to.

Judge Hunter's opinion contains a careful analysis and citations to the constitutional debates preceding the adoption of our present constitution, that of 1852, and makes the point that the intent of the convention was to so word that section and article of the constitution then under discussion so that "he [the Governor, my insert] will not be permitted to pocket a bill. . . ." I therefore conclude that under the 1816 constitution the governors also exercised the pocket veto, otherwise there would have been no such question raised in *the debates* at the constitutional convention of 1850.

I refer again to Judge Hunter's opinion, page 16, for discussion by a delegate, Mr. Morrison, on his motion and the intent to eliminate the pocket veto, which reads in pertinent part as follows: "I will call the attention of the convention to the alteration which I make. We provide, in the new section, that the Governor shall have but three days instead of five, at the close of the session, to consider bills presented to him. *And there shall be no new bills presented to him during the last two days of the sessions, so that he will not be permitted to pocket a bill but must decide upon it, one way or the other"* (emphasis supplied).

I call attention to Article 5 Sec. 14 of our present constitution and specifically to the last sentence thereof, which reads as follows: "BUT NO BILL SHALL BE PRESENTED TO THE GOVERNOR WITHIN TWO DAYS NEXT PREVIOUS TO THE FINAL ADJOURNMENT OF THE GENERAL ASSEMBLY" (capitalized for emphasis).

The intent of the delegates to the 1850 constitutional convention to eliminate the pocket veto was indicated in the debates, the method by which that intent was to be accomplished was shown by the remarks of the delegate, Mr. Morrison. The adoption of that intent and method is shown

by the last sentence of the preceding paragraph of this opinion.

Thus in the case at bar, the General Assembly of 1967, in the face of the intent of the framers of the constitution of 1852, in open defiance and violation of the clear and plain mandate of the constitution, with full knowledge of the consequences flowing therefrom, presented House Enrolled Act No. 1818 to the Governor on the last day of the 1967 session of the General Assembly. That act imposed no duty and no obligation on the Governor to take any action on House Enrolled Act. No. 1818, nor did such act become law without the Governor's signature as the very act of presenting it within the proscribed time nullified it in toto unless the Governor did in fact sign such enrolled act and deposit the signed act in the office of the Secretary of State.

The Appellate Court majority opinion contains the following citation, and we quote therefrom: "In the volume, Constitutional Limitation, by Cooley, 8th Edition, Volume 1 page 355, Cooley makes the following statement concerning state constitutions:

'That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is therefore the paramount law.'

On page 81 of the same volume, we find the following statement:

'By the constitution which they establish, they not only tie up the hands of their official agencies, but their own hands as well; and neither the officers of the state, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law.' "

I deem it unnecessary to further expand this opinion as the constitutional mandate is clear and the violation thereof by the 1967 General Assembly only too apparent, as are the consequences of such violation. This cause should be transferred to this Court, the erroneous judgment of the Appellate Court

reversed, and said cause remanded thereto with instructions to sustain defendant's motion for judgment, all at the costs of the plaintiff.

DeBruler, C. J., concurs; Givan, J., not participating.

NOTE.—Reported in 244 N. E. 2d 111.